The **WARREN TRUST** and the **Marietta Trust, Plaintiffs,**

v.

The **UNITED STATES, Defendant.**

**No. 10–06 L**

United States Court of Federal Claims.

(Filed: November 30, 2012)

John Baird King, Baton Rouge, LA, for plaintiffs.

Brook B. Andrews, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

SWEENEY, Judge

Before the court is plaintiffs' motion for summary judgment on liability and defendant's cross-motion to dismiss or for summary judgment on liability. In this case, plaintiffs, the Warren Trust and the Marietta Trust ("plaintiffs" or "the Trusts," collectively), allege that the government effected a regulatory taking under the Fifth Amendment to the United States Constitution by

applying a regulatory regime on the Trusts' property, which is located in a former bombing range in Louisiana. The Trusts seek summary judgment on liability, and defendant moves, pursuant to Rules 12(b)(1) and 12(h)(3) of the Rules of the United States Court of Federal Claims ("RCFC"), to dismiss the amended complaint, asserting that the court lacks jurisdiction for two reasons: that the amended complaint is barred by 28 U.S.C. § 1500 and that it sounds in tort. Moreover, defendant cross-moves for summary judgment, arguing that the Trusts failed to demonstrate a taking of a compensable property interest. For the reasons discussed below, plaintiffs' motion for summary judgment is denied, defendant's motion to dismiss is denied, and defendant's cross-motion for summary judgment is granted.

## I. FACTUAL BACKGROUND

### A. The Hammond Bombing and Gunnery Range

In January 1942, the United States Army ("Army") identified and initiated bids for the construction of an airfield and bombing range in southeastern Louisiana, near the city of Hammond.[1] Def.'s Ex. A at USA001490. The Army selected this site, which spanned approximately 15,215 acres, because of its proximity to other Army airfields and because of its low population density.[2] *Id.* The site was named the Hammond Army Air Field, and within that site, the Army planned and constructed the Hammond Bombing and Gunnery Range ("Range"), to provide an area for gunnery, rocket, and bombing practice for pilots deploying overseas in World War II. *Id.*

By late summer 1942, the Hammond Army Air Field was declared operational and on August 10, 1942, B–26 bombers from the 319th Bomb Group initiated the Range with a low-level bombing exercise. *Id.* From August 1942 to September 1945, the Army trained pilots at the Hammond facility for a variety of combat missions. Def.'s PFUF ¶ 3. P–51 fighter pilots practiced rocket attack, bombing, and strafing runs at the site,[3] and B–26 crews practiced lowlevel bombing. Def.'s Ex. A at USA001538–39. In addition, B–17 crews dropped 2,000–pound bombs at the site, which were known to rattle the windows as far as five miles away in Hammond, Louisiana. Def.'s Ex. B at USA003487. The Army also operated a rifle range at the site. Def.'s Ex. C at USA000080. At present, the precise amount of unexploded ordnance ("UXO") on the Trusts' property is unknown.[4]

At the end of the war, the government closed the Hammond Army Air Field and Range, discontinuing airfield operations on September 15, 1945. Def.'s Ex. A at

---

1. The facts and some of the parties' arguments are derived from the complaint ("Compl."); amended complaint ("Am.Compl."); the exhibits attached to plaintiffs' motion ("Pls.' Ex."); the exhibits attached to defendant's cross-motion ("Def.'s Ex."); the exhibits attached to plaintiffs' opposition to defendant's cross-motion ("Pls.' Opp'n Ex."); plaintiffs' proposed findings of uncontroverted fact ("Pls.' PFUF"); defendant's proposed findings of uncontroverted fact ("Def.'s PFUF"); plaintiffs' response to defendant's proposed findings of fact ("Pls.' Resp. to Def.'s PFUF"); and defendant's response to plaintiffs' proposed findings of fact ("Def.'s Resp. to Pls.' PFUF"). Other arguments are taken from the Trusts' Motion for Summary Judgment on Liability ("Motion"); defendant's Cross–Motion to Dismiss or for Summary Judgment and Response in Opposition to the Trusts' Motion ("Cross–Motion"); the Trusts' Opposition to the Cross–Motion ("Opp'n to Cross–Motion"); defendant's Reply ("Reply to Opp'n"); defendant's April 6, 2012 Supplemental Brief ("Def.'s Supp'l Br."), the Trusts' April 27, 2012 Response ("Pl.'s Supp'l Resp."); and defendant's May 11, 2012 Reply ("Def.'s Supp'l Reply"). Unless otherwise noted, the facts are undisputed.

2. The Army procured leases from over twenty landowners, including plaintiffs' predecessor in title, the Lake Superior Piling Company. Def.'s Ex. A at USA001637.

3. Strafing is the practice of attacking ground targets from low-flying aircraft using aircraft-mounted automatic weapons.

4. The Trusts allege that ten percent of the bombs (including the 2,000–pound bombs) dropped on the Range were duds, meaning that they were armed but did not explode. Pls.' Ex. A–3 at 3. However, as defendant points out, the citation the Trusts provide concerning UXO: (1) states "[d]epending on the type of munition, a[ ] dud rate as high as 10% is not uncommon," and (2) does not make a factual finding with respect to any unexploded bombs on the Range. *Id.*; Def.'s Resp. to Pls.' PFUF ¶ 5.

USA001490. Before vacating the site, the Army conducted shoulder-to-shoulder surface cleanup of the Range in an attempt to remove any remaining ordnance. *Id.* at USA001538, USA001541–42. On November 1, 1946, all government-acquired property rights were relinquished, and the land was returned to its owners. *Id.* at USA001542.

## B. The Warren Trust and the Marietta Trust

In either late December 1951 or early 1952,[5] Frederick William Reimers entered into a lease and option agreement with the Lake Superior Piling Company to purchase timber rights over a large area of land, a portion of which was inside the Range. Def.'s PFUF ¶ 5; Pls.' PFUF ¶ 6a;[6] Def.'s Ex. D at TRUST000143. Mr. Reimers converted the land mainly from grazing to timber. Pls.' PFUF ¶ 6a; Def.'s PFUF ¶ 6. Mr. Reimers purchased the remaining property rights, in fee, from the Lake Superior Piling Company through several purchases starting in 1956. Def.'s Ex. F at TRUST000152–153. The Trusts became the lessee and/or owner of that property and purchased most of the land in the 1970s, with the bulk being purchased around 1972. Pls.' PFUF ¶ 6a. Mr. Reimers and the Trusts have leased, occupied, and owned this property continuously since 1952. *Id.* At the time of Mr. Reimers's death, the Trusts owned approximately 18,-171 acres in Tangipahoa Parish, Louisiana, and surrounding areas, and roughly 11,200 of these acres lie within the Range (the Trusts' property within the Range will hereinafter be referred to as the "Range Property" and the large parcel, the approximately 18,171–acre tract, including the Range Property, will be referred to as "the property"). Pls.' Ex. A–6 at 13–14.

In 1958, before his death, Mr. Reimers provided for the creation of two testamentary trusts, the Warren and Marietta trusts, named for his two surviving children, Warren D. Reimers and Marietta Reimers Schneider. Pls.' Ex. A ¶ 3. Carl Schneider, the son of Marietta Reimers Schneider and the grandson of Mr. Reimers and one of plaintiffs' three trustees, spent time on the Range Property as a child and recalls that within the Trusts' vast timber holdings, the Range Property was commonly referred to as "the bombing range."[7] Def.'s Ex. E at 14:14–18, 22:18–22, 29:21–22. The Range includes the land owned by the Trusts and land owned by others.[8] Pls.' PFUF ¶ 8. The boundaries of the Range were determined by the United States Army Corps of Engineers ("Corps") without input from the Trusts or other landowners and generally coincide with property leased by what was then known as the War Department during World War II. *Id.* ¶ 9. During this period, a lease between an individual landowner and the War Department was not recorded in the mortgage or conveyance records of Tangipahoa Parish, Louisiana. *Id.*

## C. The Defense Environmental Restoration Program and Formerly Used Defense Sites Program

In 1980, Congress enacted the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), which provided broad federal authority to respond to releases or threatened releases of hazardous substances that might endanger public health or the environment. 42 U.S.C. §§ 9601–9675 (1980). Then in 1986, Congress amended CERCLA to create the Defense Environmental Restoration Program ("DERP"), which operates under the same regulatory

---

**5.** Plaintiffs claim early 1952, Pls.' PFUF ¶ 6a, and defendant claims December 1951, Def.'s PFUF ¶ 5. The exact date is immaterial for purposes of ruling on the parties' motions.

**6.** Plaintiffs' opposition to defendant's proposed findings of fact contains two number "6" paragraphs. To avoid confusion, the court cites to the first "6" paragraph as "6a" and the second as "6b."

**7.** From 1958 to 2008, the Trusts' property and its timber production was managed by the Bennett

and Peters Company. Def.'s Ex. E at 71:7–25. Beginning in 2008, the Reimers Company assumed management of the Trusts' property and timber. Def.'s Ex. G at 11:10–13. Mr. Schneider currently directs the operations of the Reimers Company, which manages the Trusts' property holdings. Def.'s Ex. E at 15:23–16:24; Pls.' Ex. A ¶ 2.

**8.** Obviously, the Trusts can only assert a taking for the property that they own.

structure as CERCLA, but is intended to address hazardous substances or munitions at each current and formerly used defense sites ("FUDS"). 10 U.S.C. §§ 2700–2723 (1986). Additionally, Congress, as part of the John Warner National Defense Authorization Act for Fiscal Year 2007, imposed requirements on the Secretary of Defense ("Secretary") regarding UXO, including requiring the Secretary, by September 30, 2010, to complete "site inspections of unexploded ordnance" at FUDS. Pub.L. No. 109–364, § 313(a)(2), 120 Stat.2083, 2138 (2006).

The FUDS program is intended to identify, investigate, and clean up contamination resulting from United States Department of Defense ("DoD") activities on property that was at one time under the jurisdiction, ownership, control, or possession of the United States military. *Id.* To be eligible for the program, government ownership or control must have terminated before October 17, 1986. Def.'s Ex. I ¶ 5. The stated goals of the FUDS program are "to reduce risk to human health and the environment through implementation of effective, legally compliant, and cost-effective response actions." Def.'s Ex. I–1 at 1. Consistent with the statutory goals of the DERP, the DoD established three program categories to classify activities at FUDS. *Id.* Of relevance here is the military munitions response program, which includes projects to address munitions and explosives of concern, munitions constituents, and recovered chemical warfare material. *Id.*

The Army, on behalf of DoD, is charged with meeting all applicable requirements, regardless of which DoD component previously owned or used the property. *Id.* at 6–7. The Army has further delegated the program management and execution responsibility for the FUDS program to the Corps. *Id.* at 7. Since that delegation of authority, Corps District Commanders are responsible for all activities associated with the FUDS program at these properties, including coordinating regulatory and community involvement and ensuring compliance with applicable laws, regulations, and policies. *Id.* at 8.

Once a property is identified as a FUDS, a determination of property eligibility is made based primarily upon a review of real estate and historical records. *Id.* at 10. As of September 30, 2010, the Corps had identified 10,027 properties for potential FUDS designation, and of these, 6,992 had been determined to be FUDS eligible. *Id.* at 1. Upon determining that a FUDS has confirmed or potential munitions and explosives of concern or munitions constituents, the Corps is required to conduct a remedial site inspection ("SI"). Pls.' Ex. D at 4–3, 4–4. The goal of the SI is to find sufficient evidence to determine whether munitions and explosives of concern are present or not likely present. Pls.' Ex. E at 5. In "most cases," encountering just one munitions and explosives of concern item will be sufficient to warrant a remedial investigation/feasibility study for a particular military munitions response program project. *Id.* An SI Report is then generated, which contains recommendations for further action, if necessary. Pls.' Ex. D at 4–5. Further action could include a removal action or a remedial investigation/feasibility study, or if no potential hazards are identified, the SI Report would assign a No Defense Action Indicated status. Def.'s Ex. J at USA001291. If a removal action is not appropriate, a remedial investigation/feasibility study must be conducted in order to ensure that appropriate remedial alternatives are developed and evaluated and an appropriate remedy is selected. Pls.' Ex. D at 4–3, 4–7. Once a remedy is selected, a proposed plan must be prepared to begin the remediation process. *Id.* at 4–12.

### D. The Government's Investigation of the Range

#### 1. The First Corps Site Visit and FUDS Designation

The Corps' first visit to the Range Property occurred on February 13, 1995. Def.'s Ex. B at USA003487. Judge Leon Ford, III, a local historian and friend of the Reimers who wrote a book about the Range, accompanied the Corps on this visit. *Id.* In his book, "Hammond Army Airfield and Early Aviation in the Hammond Area," which was published in 1996, Judge Ford chronicled the history of the Range and its relevance to the war effort, and provided a detailed reporting of the types of airplanes and weapons used at

the site. Def.'s Ex. A at USA 001634. Mr. Carl Schneider recalled that Judge Ford gave his parents a copy of his book. Def.'s Ex. E at 33:17–34:3. Mr. Schneider acknowledged that he read or skimmed a copy of the book shortly after it was published. *Id.* at 33:1–25. Although he never discussed the book in detail with Judge Ford, Mr. Schneider did compliment the judge on his accomplishment. *Id.* at 34:4–9.

Before the site inspection, the Corps reviewed target area maps and interviewed Judge Ford concerning his knowledge of the use of the Range Property. Def.'s Ex. B at USA003487. At the site, employees of Bennett and Peters (the entity that managed the Trusts' property from 1958 to 2008) produced old aerial photos depicting bomb craters for the Corps to review. *Id.* From this investigation, and through their interviews with employees of Bennett and Peters, the Corps learned that there were a number of bomb craters on the Range Property, some as wide as thirty feet. *Id.* Also present on the land were "pieces of steel that appear[ed] to be shrapnel from the bombs." *Id.* Based upon this investigation, the Corps concluded: "[i]t is anticipated that unexploded bombs could have buried themselves in these areas." *Id.*; *see also* Def.'s Ex. A at USA001616; Def.'s Ex. M at USA001704. The Corps' inspection results were detailed in two documents, the "Summary of OEW Investigations," and a "DERP Trip Report," dated March 8, 1995. Def.'s Exs. B & N at USA003486–87. The DERP Trip Report concluded that the "site should be further investigated for buried or hidden unexploded ordnance." Def.'s Ex. N at USA003486.

On July 5, 1995, the findings of this visit were incorporated into a Site Summary Survey Sheet, which was attached to an Inventory Project Report. Def.'s Ex. A at USA001616. On July 17, 1995, Colonel Kenneth Clow issued a memorandum to the Commander of the Corps' Lower Mississippi Valley Division forwarding the Inventory Project Report and the "DERP–FUDS Preliminary Assessment of the Hammond Bombing Range." Def.'s Ex. M at USA001696. In the memorandum, Colonel Clow recommended that the Commander approve the preliminary determination of FUDS eligibility and move the project forward "for determination of the need for further study to determine potential for unexploded ordnance at the Hammond Bombing Range." *Id.* On September 9, 1996, the Lower Mississippi Valley Division approved the determination of FUDS eligibility and forwarded the Inventory Project Report to the Huntsville Division for further study and any necessary remedial action. *Id.* at USA001694. On July 9, 1997, the Huntsville Division recommended to the Lower Mississippi Valley Division that a phased Engineering Evaluation and Cost Analysis be scheduled for the site. Def.'s Ex. O at USA001692.

### 2. The Second Corps Site Visit

In 2002, the Corps sent plaintiffs a letter requesting permission to visit the Range Property. Def.'s Ex. G at 22:2–11. Jeanine Connelley, a long-time employee of Bennett and Peters, received the request and considered the option of denying the Corps access. *Id.* at 23:9–25. However, after discussions with trustee Tom Lewis, the Trusts granted the Corps permission and arranged for the site visit. *Id.* at 22:14–15.

In early April 2002, the Corps conducted its second site visit of the Range Property, during which Corps representatives interviewed several long-time Bennett and Peters employees at length about their experiences with munitions on the Range Property. Def.'s Ex. A at USA001542, USA001652–56. For example, the Corps interviewed Mr. Brent Dunnington, who had worked on the property for more than twenty-five years. *Id.* at USA001541, USA001654. Mr. Brent Dunnington stated that although he had never seen live ordnance, he had observed sand-filled practice bombs, "small bombs weighing a couple of pounds with a hole through the center," and small arms projectiles. *Id.* at USA001541. The Corps also interviewed Mr. Barney Wall, who had worked on the property for over twenty-seven years, also reported that he had seen sand-filled bombs near the target areas. *Id.* at USA001540, USA001653. Mr. Barney Wall escorted the Corps representative around the Range Property and directed them to large craters he believed to have been caused by high impact explosive

bombs, and to the remnants of ANM38 sand-filled bombs and .50 and .30 caliber projectiles. *Id.* The Corps also interviewed Mr. Bubba Dunnington, who had worked on the property for more than forty years. *Id.* at USA001540, USA001652. Mr. Bubba Dunnington similarly reported that he had come across sand-filled bombs, small mortar-like bombs, and small arms projectiles. *Id.* None of the Bennett and Peters employees reported coming into contact with what appeared to be live munitions.

### 3. The Archives Search Report

In March 2003, the Corps issued an Archives Search Report, which contained a Risk Assessment for each of the five munitions response sites identified within the footprint of the Range. Def.'s Ex. A at USA001494, 001501, 001508, 001512, 001519, 001533. The Corps' risk assessment procedure, represented by the Risk Assessment Code, is used "to assess the risk involved based on the *potential* [explosive ordnance] hazards identified at the site." *Id.* at USA001494. The Corps' risk assessment is "composed of two factors, *hazard severity* and *hazard probability.*" *Id.* The Risk Assessment Code is rated on a 1–5 scale, 1 being the most hazardous and 5 being the least hazardous. *Id.* at USA001500. The Archives Search Report also designated whether an area had a confirmed or potential ordnance and explosives presence. *Id.* at USA001546. A confirmed presence of ordnance and explosives is based on historical record evidence or direct witness of such items since site closure, while a potential presence of such items is based on a lack of confirmed presence. *Id.* Regarding the Range, the Risk Assessment in the Archives Search Report allocated a Risk Assessment Code of 3 for Bomb Target A; a 3 for Bomb Target B; a 5 (No Defense Action Indicated status) for Areas C (formerly used as the Rifle Range) and D (formerly used as the Gunnery Range); a 4 for Area E (the Multiple Use Target); and a 3 for the entire site. *Id.* at USA001494, 001501, 001508, 001512, 001519, 001533.

Detailed findings from the Archives Search Report follow. Bomb Target A is located in the north-central portion of the Range. *Id.* at USA001543. The area has been plowed,

leaving furrows on which pine trees are planted, and numerous deep craters from bombing with high-explosive bombs are visible. *Id.* Small pieces of high-explosive bomb fragments were found lying on the ground. *Id.* Therefore, Bomb Target A was confirmed as having ordnance present. *Id.* at USA001547. Bomb Target B is located on the east-central portion of the Range. *Id.* This area also has been planted with pine trees, but the growth is older and denser making it difficult to locate the former practice bomb target. *Id.* The actual target center appeared to be under water. *Id.* The report concluded that "the possibility of buried high explosive bombs exists for this target." *Id.* at USA001543–44. Like Bomb Target A, Bomb Target B was confirmed as having ordnance present. *Id.* at USA001547. Area C, the former Rifle Range, is located on the west-central-most portion of the Range, and like the other areas, has been planted in pine. *Id.* at USA001544. A hunting club leases the area where the firing points are located. *Id.* An inspection revealed .30 caliber projectiles, but no other ordnance items were observed and no craters were observed. *Id.* Area C was considered to have no ordnance present. *Id.* at USA001548. Area D, formerly the Gunnery Range, is located north of the Rifle Range, and this area is limited to landowners and the hunting club that leases the land. *Id.* The area is also used for production of timber. *Id.* The two banks of strafing targets are no longer present. *Id.* Area D was also considered to have no ordnance present. *Id.* at USA001548. Area E, formerly the Multiple Use Target, is several miles northeast of the strafing target. This area has been plowed and planted with pine. *Id.* at USA001545. The Multiple Use Target was a "somewhat" eroded mound of soil about six feet high and roughly twenty feet in diameter. *Id.* Embedded in the mound were scraps of rusted metal from practice bombs, and numerous .50 caliber projectiles were observed. *Id.* Because of standing water, it was not possible to conduct a full inspection; however, the report stated that it can be assumed that this target was used as a bombing target, gunnery target, and possi-

ble rocket target.[9] *Id.* Area E was considered to have confirmed ordnance present. *Id.* at USA001549.

#### 4. The Technical Project Planning Meeting

On February 14, 2008, the Corps and Parsons, its contractor hired to assist the Corps to perform the SI and prepare a draft SI Report, held a Technical Project Planning ("TPP") meeting to discuss the planned SI for the Range. Def.'s Ex. P at TRUST001057. The Trusts were provided with information related to the SI and the TPP meeting in advance of the meeting, which was attended by their representatives. Def.'s Ex. G at 24:13–22, 26:18–27:11, 29:20–33:16. The Corps informed the meeting's attendees that the purpose of the SI was to ensure existing sites within the Range were sufficiently evaluated to comply with the Corps' requirements and to collect sufficient data to determine whether individual project sites warranted further response action or could be declared safe. Def.'s Ex. P at TRUST001057; Def.'s Ex. Q at TRUST001059. At this meeting, the Corps informed the Trusts that the Corps "could not give [the Trusts] any specific instructions about how [they] were to use the property." Def.'s Ex. G at 106:2–14; 107:6–12. Instead, the Corps provided information about how the SI would proceed.[10] See Def.'s Ex. Q at TRUST001059. During the meeting, the Trusts received information for the first time from a local deputy sheriff that he had responded to live ordnance findings on three occasions during the 1969–1970 time frame.[11]

Pls.' Ex. A ¶ 12. Also during the meeting, one of the Trusts' representatives informed the Corps that the Trusts had development plans for the Range Property. *Id.*

#### 5. The Site Inspection and Resulting Reports

On April 16, 2008, Parsons Project Manager Julie Burdey sent a letter to plaintiffs informing them of the Corps' desire to conduct a SI of the Range. Def.'s Ex. R at USA001718. She requested permission to enter the Trusts' Range Property and enclosed a right-of-entry form for the trustees' signatures. *Id.* at USA001716–18. The right-of-entry form granted the Corps the right to enter the property between May 1 and November 1, 2008, for a period not to exceed a total of fourteen days. *Id.* at USA001716. The right of entry stipulated that it "may be revoked in writing by the undersigned upon 30 days prior notice delivered to the Department of the Army." *Id.* Plaintiffs' trustees received Ms. Burdey's letter and discussed the right of entry. Def.'s Ex. G at 36:8–25. Mr. Schneider ultimately decided that plaintiffs should sign the right-of-entry form in order to remove the "stigma" that had been put on the land. Def.'s Ex. E at 28:1–3. Additionally, Mr. Schneider worried that if the Trusts denied the Corps access–and munitions were later discovered at the bombing range–that the Trusts would have to bear the full responsibility of removing the ordnance. *Id.* at 28:4–9. On May 22, 2008, the Trusts returned the signed right of entry to Ms. Burdey. Def.'s Ex. R at USA001719.

---

9. During the wet season, there is considerable standing water throughout the Range. Def.'s Ex. Q at TRUST001086.

10. Defendant also asserts that the Corps provided safety instructions at this meeting. Cross–Motion 15 (citing Def.'s Ex. E at 107:6–12). However, the citation that defendant provides does not support this assertion. If defendant merely provided the court with an incorrect citation, counsel may file an errata providing the court with the correct citation. In any event, in October 2009, the Corps did provide safety instructions. See Pls.' Ex. A–5. In particular, the Corps held a community meeting, during which it discussed the history of the Range and the Final SI Report, and provided a safety presentation concerning what a person should do if he or

she comes into contact with what was or appeared to be UXO. *Id.*

11. The Trusts claim that before 2008, they had not been notified or otherwise informed of any UXO being found on the Range Property. Pls.' Ex. A ¶ 10. Defendant, however, states that the Trusts have never been notified, either before or after 2008, of any UXO found on the Range Property because none has ever been found. Def.'s Resp. to Pls.' PFUF ¶ 11. Instead, the Corps has only concluded there is a risk of UXO being on the Range Property because of its prior use as a bombing range. *Id.* The Trusts and their agents have been aware of the Range Property's use as a bombing range, as well as the presence of bomb fragments, practice bombs, and shell casings on the Range Property, for decades. *Id.*

Parsons conducted the SI in August 2008. Def.'s Ex. C at USA000220. In January 2009, Parsons issued a Draft SI Report, in which it recommended that the Corps move forward with a remedial investigation/feasibility study for three of the five surveyed sites. Pls.' Ex. A–2 at ES–4. These three sites were the ones identified as Bomb Target A, Bomb Target B, and the Multiple Use Target (identified as Area E above). *Id.* The remaining two sites, the Rifle Range (identified as Area C above) and the Gunnery Range (identified as Area D above), were recommended for No Defense Action Indicated status, meaning that no further DoD action would be necessary. *Id.* Through 2009, the draft was reviewed by the Corps and the landowners, including plaintiffs, who submitted comments. Pls.' Ex. A–3.

During the preparations for the SI and the comment and review process following the issuance of the Draft SI Report, plaintiffs had many conversations with Corps representatives. Def.'s PFUF ¶ 73. In these conversations, the Corps stated that it could not control or otherwise tell landowners what to do with their property. Def.'s Ex. E at 90:9–12; Def.'s Ex. G at 106:2–107:20. When asked whether plaintiffs should change their activities on the Range Property, the Corps stated it could not offer plaintiffs advice. Def.'s Ex. G at 106:2–14. The Corps further told plaintiffs that it "could not give [them] any specific instructions about how [they] were to use the property." *Id.* at 107:6–12.

The draft recommendation was ultimately approved, and the Corps issued the Final SI Report in June 2009. Def.'s Ex. C at USA000061. With respect to the two bomb target areas (Bomb Target A and Bomb Target B) and the Multiple Use Target (Area E), the Final SI Report recommended that these areas proceed to remedial investigation/feasibility study, and with respect to the Rifle Range (Area C) and the Gunnery Range (Area D), the Final SI Report recommended No Defense Action Indicated status. *Id.* at USA000082. The Final SI Report further found that significant structures located within the FUDS boundary were private full-time residences and recreational temporary residences (e.g., hunting trailers). *Id.* at USA000092. Roughly five permanent residences existed in Bomb Target B area, the Rifle Range, and the Gunnery Range, but more than twenty-six residences likely existed within the Bomb Target A and Multiple Use Target boundaries. *Id.* at USA000093. The Final SI Report also determined that there were many more residences and businesses within the FUDS boundary but outside of the munitions response sites. *Id.* The Final SI Report assigned a revised Risk Assessment Code for each munitions response site. *Id.* at USA000095. As previously explained, scores of "1" and "5" indicate the highest and lowest hazard potentials, respectively. *Id.* Bomb Target A received a score of 4, which had previously been a 3; Bomb Target B also received a score of 4, which had previously been a 3; the Multiple Use Target (Area E) received a score of 4; and the Rifle Range (Area C) and the Gunnery Range (Area D) each received a score of 5. *Id.* at USA000115–18. The Final SI Report determined:

> [T]here is the possibility that human receptors might come into contact with explosively hazardous [munitions and explosives of concern] at Bomb Target [A], Multiple Use Target, and Bomb Target [B]. Therefore, there is the potential for an explosive safety risk at these MRSs [munitions response sites]. However, no explosive hazards remain at the Rifle Range or Gunnery Range and, therefore, no explosive safety risk is considered to be present at these [munitions response sites].

Def.'s Ex. C at USA000176. Therefore, the Corps' Final SI Report concluded that 1,649 of the 11,282 acres owned by the Trusts in the Range presented no risk sufficient to require further investigation. *See id.* According to the government, the remedial investigation/feasibility study will not be performed until 2019 or 2020, but the date could be postponed. Pls.' Ex. B at 9.

### E. Current Uses

The Trusts' Range Property has been used since approximately 1952 without incident. Pls.' PFUF ¶ 12. Since World War II, the Range Property has been traversed numerous times, and roads have been built on the

land. *Id.* The Range Property has been cultivated using heavy machinery and trees have been planted and harvested several times. Pls.' Opp'n Ex. H ¶ 6. The Range Property has also been leased. In particular, the Trusts lease two acres along United States Highway 190 ("Highway 190") at the very edge of the Range to the Office of Forestry of the Louisiana Department of Agriculture and Forestry. Pls.' Ex. A ¶ 16. The Office of Forestry has a fire tower on the site. *Id.* The lease amount is and has remained one dollar per year, and the current lease was entered into in 2004. *Id.* The Trusts also lease a few acres along Highway 190 at the very edge of the Range to the Eighth Ward Volunteer Fire Department, which maintains a fire station on the site. *Id.* ¶ 17. Just as with the Office of Forestry, the lease amount is and has remained one dollar per year. *Id.* The current lease was entered into in 2002. *Id.* The Trusts assert that these leases "are not regarded as sources of income," but rather are "public services." *Id.* ¶ 19 (stating that the lease payment of one dollar per year is designed to provide binding consideration under Louisiana law). The Trusts also lease over 13,000 acres inside and outside of the Range to the South Tangipahoa Hunting Club for the sum of four dollars per acre, for a total of over $54,000 per year.[12] *Id.* ¶ 18; Def.'s Ex. H. The Trusts also leased acreage to the Austin Powder Company, an explosives manufacturing company. Pls.' Ex. A ¶ 20. The company sought to increase the acreage it leased in order to expand its operations, but because its expansion conflicted with the Trusts' development plans and efforts, the company's lease was not renewed. *Id.* The Trusts did not want an explosives company located next to any possible development, whether industrial, commercial, or residential. *Id.*

After the Corps issued the June 2009 Final SI Report, the Trusts amended its leases in the Range Property to acknowledge "that all or part of the leased area was part of the Hammond Bombing and Gunnery Range[,] which was used during World War II for bombing, rocket, and gunnery practice by the United States military," and that "unexploded ordnance (UXO) and munitions and explosives of concern (MEC) may be present on or below the surface of the leased area." Def.'s Exs. H at TRUST001140, K at TRUST000862, L at TRUST000879. The Trusts also released themselves from liability resulting from contact with any UXO or munitions and explosives of concern. *Id.* Nothing in the record reflects that these leases were terminated or changed in value as a result of the issuance of the Final SI Report. [13]

Timbering or forestry has been the main source of income from both the Range Property and the Trusts' property located outside of the Range and has accounted for over 99% of Trusts' income in the years immediately prior to 2008. Pls.' Ex. A ¶ 21; Def.'s Ex. G at 57:25–58:3. The Reimers Company, following the practice of Bennett and Peters, enters into contracts with purchasers who then access the property and harvest the timber. Def.'s Ex. G at 58:15–59:25.

### F. Development Efforts

Plaintiffs claim that the Trusts have also generated income from the sale of their property located inside and outside of the Range, which was then used by the purchasers for commercial or residential purposes. Pls.' Ex. A ¶ 22. Defendant argues, however, that plaintiffs have put forth no evidence to support this assertion, and that plaintiffs have limited the use of the Range Property for hunting and timber for at least fifty years. Def.'s Resp. to Pls.' PFUF ¶ 23.

---

12. The Trusts assert that this amount "is well below" the property's "income producing potential," but defendant argues that plaintiffs have put forth no competent evidence to support their claim. Pls.' Ex. A ¶ 18; Def.'s Resp. to Pls.' PFUF ¶ 16. As explained *infra* at parts IV.C.2.b and IV.C.3, this disagreement does not raise a genuine issue of material fact such that the court is precluded from granting summary judgment for defendant.

13. Ms. Connelley, an employee of the former Bennett and Peters and now of Reimers Company, stated in her deposition in August 2011 that timber production and the lease of land to the hunting club had not been impacted, but Mr. Schneider, in an affidavit in November 2011, stated that no timbering activities are ongoing at the Range Property. Def.'s Ex. G at 54:16–20, 57:16–22, 60:17–22; Pls.' Opp'n Ex. H ¶ 4.

To support their allegations of development efforts, plaintiffs note that in 2007, they commissioned a "Tangipahoa/St. Tammany Strategic Land Plan" ("Strategic Land Plan"), which envisioned and assessed the development potential of plaintiffs' landholdings in Tangipahoa Parish and neighboring St. Tammany Parish. Pls.' Ex. A–6. The Strategic Land Plan identified potential land uses, including a "mega industrial site," a regional airport, and residential and commercial developments. *Id.* In 2008, plaintiffs explored constructing a "mega site" on their property that incorporated and relied on plaintiffs' property both inside and outside of the Range. *Id.* The entire "mega site" depended upon the development of a new interchange on United States Interstate 12 ("Interstate 12"), which would have been constructed on plaintiffs' land located outside of the Range. *Id.* at 12–14. Plaintiffs' preliminary plans contained two proposed sites for the "mega site" itself. Pls.' Ex. A–6. One, consisting of 1,700 acres, was located on plaintiffs' land outside of the Range. *Id.* The other, consisting of 1,500 acres, was located on plaintiffs' land within the Range. *Id.*; Def.'s Ex. E at 59:21–60:1.

As plaintiffs' contemporaneous documents demonstrate, in order to construct a "mega site" within the Range Property, plaintiffs would have had to accomplish, among other things, the following:

(1) identify a site of 700 to 1,000 contiguous acres that did not require wetland permitting;

(2) prepare a plan for zoning approval along with a supporting study;

(3) locate sites for sewer and water utilities, identify an operator to construct and operate those utilities, and secure local government approval for those sites;

(4) acquire properties in order to build a highway interchange, either privately or by condemnation with the cooperation of local authorities;

(5) evaluate and propose road improvements to state officials;

(6) convince local, state, and federal officials of the longterm need for an interchange and seek funding for it;

(7) conduct a market study to support the zoning, sewer plan, highway interchange, and "mega site";

(8) conduct a traffic study;

(9) secure state economic development agency support;

(10) secure Tangipahoa Parish support;

(11) find and secure an anchor employer to locate in the area;

(12) seek Tangipahoa Parish, Louisiana, and Tennessee Valley Authority approval of "mega site" status; and

(13) secure congressional support, in both the House of Representatives and Senate, for the interchange and the "mega site."

Pls.' Ex. A–7 at TRUST000599.

With the exception of obtaining the support of local officials for the concept of a "mega site," the Trusts had not accomplished any of these goals by June 2009. Def.'s Ex. E at 52:3–25. Plaintiffs had not acquired all the property they needed to build the necessary interchange.[14] *Id.* at 54:9–13. Plaintiffs had neither sought nor received any of the necessary state and local permits they needed, any of which could have been denied. *Id.* at 63:14–19. And, plaintiffs had not conducted a wetlands determination of the Range Property to determine how much of it could be developed. *Id.* at 47:10–15, 53:15–23. In sum, plaintiffs' Range Property was not zoned for development, was not financed for development, was not surveyed for development, and was not permitted for development at the time the Final SI Report was issued. Def.'s Ex. E at 52:3–25; 54:9–13; 63:14–19.

Despite plaintiffs' failure to accomplish all thirteen milestones that they themselves identified as necessary prerequisites for their development plan, the Trusts nonetheless assert that as a result of the conclusions drawn in the Draft and Final SI Reports, the Trusts

---

**14.** During an August 2008 meeting to discuss the proposed interchange, Wade Ragas, who apparently is a real estate appraiser, informed others in attendance that "it will be one more year before demand for residential and commercial developments begin to increase." Pls.' Ex. A–8.

were forced to curtail current uses of the Range Property and eliminate future uses. Pls.' Ex. A ¶¶ 30–31. For instance, the Trusts claim that they will have to forgo future timber sales agreements, and as a result, will lose 100% of the income they received from harvesting timber. Id. ¶¶ 33–34. Moreover, plaintiffs' allege, plans to develop the Range Property have been eliminated, as allowing developers onto the Range Property could endanger their safety. Id. ¶ 36. The Trusts assert that developers seeking to enter into agreements with the Trusts ceased discussions when the Draft and Final SI Reports were released. Id. ¶ 38. The Trusts claim that one developer, KB Homes, offered the Trusts "at least" $10,000 per acre. Id.; see also Pls.' Ex. I ¶ 18 (Affidavit of Carl Prevost, the Trusts' real estate broker). In their affidavits, the Trusts' do not provide any details about this offer, other than an uncertain price, or attach any documentation that would corroborate their claims about the offer. Lastly, the Trusts state that an appraisal was commissioned to provide a general understanding of the loss of value brought on by the Final SI Report. Pls.' Exs. H, H–2.

Defendant contests these statements. In particular, it asserts that any explosive risk on the Range Property was the same both before and after the issuance of the Draft and Final SI Report. Def.'s Resp. to Pls.' PFUF ¶¶ 151–55. Moreover, defendant argues that plaintiffs have harvested timber on the Range Property subsequent to the June 2009 issuance of the Final SI Report, and even if the property could not be harvested, plaintiffs would not lose the timber value, which could be exploited upon further investigation and any necessary remediation. Id. ¶¶ 129–30, 132. Defendant, suggesting that plaintiffs have not offered a comprehensive plan for development of the Range Property, asserts that the Trusts have never conducted a wetlands assessment, so they do not know exactly how much of the Range Property

contains wetlands. Def.'s Ex. E at 47:10–15. Defendant contends that plaintiffs' property both inside and outside of the Range is believed to contain extensive regulated wetlands. See Pls.' Ex. A–6 at 14.

## II. PROCEDURAL BACKGROUND

The Trusts filed a complaint in this court on January 5, 2010, and filed an amended complaint on February 22, 2010. The Trusts allege that the Corps, acting pursuant to the DERP, FUDS program, and DERP regulations, produced a Final SI Report that found a potential explosive safety risk for three of the five munitions response sites, and as a result, effected a categorical, or in the alternative, a noncategorical taking of the Range Property under the Fifth Amendment. Compl. ¶¶ 31–40. Plaintiffs seek damages in excess of $27 million, based on a diminution in property value and having to forgo development on the Range Property.[15] Id. ¶¶ 48–49; id. at 6. Defendant filed its answer on April 7, 2010. After conducting discovery, the parties agreed to proceed with cross-motions for summary judgment regarding liability. The parties' motions are fully briefed, and the court is prepared to rule. Oral argument is unnecessary.

## III. LEGAL STANDARDS

### A. Subject Matter Jurisdiction

Whether the court possesses jurisdiction to decide the merits of a case is a threshold matter. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94–95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998); see also Matthews v. United States, 72 Fed.Cl. 274, 278 (2006) (stating that subject matter jurisdiction is "an inflexible matter that must be considered before proceeding to evaluate the merits of a case"). "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function

15. Plaintiffs state that the government effected a taking of roughly 11,282 acres that they own within the Range (the Range Property), but they also allege that the basis for their request for damages is only 9,634 acres within the Range. Am. Compl. ¶¶ 10, 37A, 48, 49. In their motion, the Trusts argue that the government has taken all of their property located within the Range. Motion 44. Because the court ultimately decides that the relevant parcel for the takings analysis is the Trusts' 18,000–plus–acre tract, which includes the Trusts' property inside and outside of the Range, the inconsistency in plaintiffs' pleadings is not material. See Part IV.C.2.a, infra.

remaining to the court is that of announcing the fact and dismissing the cause." *Ex parte McCardle,* 74 U.S. (7 Wall.) 506, 514, 19 L.Ed. 264 (1868). The parties or the court *sua sponte* may challenge the court's subject matter jurisdiction at any time. *Arbaugh v. Y & H Corp.,* 546 U.S. 500, 506, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006).

 The ability of the United States Court of Federal Claims ("Court of Federal Claims") to entertain suits against the United States is limited. "The United States, as sovereign, is immune from suit save as it consents to be sued." *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941). A waiver of immunity "cannot be implied but must be unequivocally expressed." *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969). Thus, unless Congress consents to a cause of action against the United States, "there is no jurisdiction in the Court of Claims more than in any other court to entertain suits against the United States." *Sherwood,* 312 U.S. at 587–88, 61 S.Ct. 767.

 The Tucker Act confers upon the Court of Federal Claims jurisdiction to "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2006). Although the Tucker Act waives the sovereign immunity of the United States for claims for money damages, it is only a jurisdictional statute. *United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). Therefore, the Tucker Act "does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages." *Fisher v. United States,* 402 F.3d 1167, 1172 (Fed.Cir. 2005) (en banc portion). The separate source of substantive law must constitute a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United

States." *Loveladies Harbor, Inc. v. United States,* 27 F.3d 1545, 1554 (Fed.Cir.1994) (en banc); *accord Martinez v. United States,* 333 F.3d 1295, 1302–03 (Fed.Cir.2003) (en banc) (explaining that the Tucker Act waives sovereign immunity for actions brought pursuant to contracts with the government, actions to recover illegal exactions of money by the government, and actions brought pursuant to "money-mandating constitutional provisions, statutes, regulations, or executive orders").

**B. RCFC 12(b)(1) Motion to Dismiss**

When deciding a motion to dismiss, the court assumes all factual allegations set forth in the complaint are true and draws all reasonable inferences in the plaintiff's favor. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds by Harlow v. Fitzgerald,* 457 U.S. 800, 814–19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *United Pac. Ins. Co. v. United States,* 464 F.3d 1325, 1327–28 (Fed. Cir.2006). Because the court's "general power to adjudicate in specific areas of substantive law ... is properly raised by a [Rule] 12(b)(1) motion," *Palmer v. United States,* 168 F.3d 1310, 1313 (Fed.Cir.1999), the court analyzes defendant's motion under RCFC 12(b)(1).

 The burden of establishing the court's subject matter jurisdiction resides with the party seeking to invoke it, see *McNutt v. Gen. Motors Acceptance Corp. of Ind.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936), and a plaintiff must establish jurisdiction by a preponderance of the evidence, *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed.Cir.1988). If the defendant or the court questions jurisdiction, the plaintiff cannot rely solely on allegations in the complaint but must bring forth relevant, adequate proof to establish jurisdiction. See *McNutt,* 298 U.S. at 189, 56 S.Ct. 780. When ruling upon a motion to dismiss for lack of subject matter jurisdiction, the court may examine relevant evidence in order to decide any factual disputes. See *Moyer v. United States,* 190 F.3d 1314, 1318 (Fed.Cir.1999); *Reynolds,* 846 F.2d at 747. If the court finds that it lacks subject matter

jurisdiction, then it must dismiss the claim. RCFC 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

## C. Motions for Summary Judgment

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is genuine if it "may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505.

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The nonmoving party then bears the burden of showing that there are genuine issues of material fact for trial. *Id.* at 324, 106 S.Ct. 2548. Both parties may carry their burden by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." RCFC 56(c)(1).

The court must view the inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, the court must not weigh the evidence or make findings of fact. See *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."); *Contessa Food Prods., Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1376 (Fed.Cir.2002) ("On summary judgment, the question is not the 'weight' of the evidence, but instead the presence of a genuine issue of material fact ...."), *abrogated on other grounds by Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed.Cir.2008) (en banc); *Ford Motor Co. v. United States*, 157 F.3d 849, 854 (1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."); *Mansfield v. United States*, 71 Fed.Cl. 687, 693 (2006) ("[T]he Court may neither make credibility determinations nor weigh the evidence and seek to determine the truth of the matter. Further, summary judgment is inappropriate if the factual record is insufficient to allow the Court to determine the salient legal issues."). Entry of summary judgment is mandated, "after adequate time for discovery," against a party who fails to establish "an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

## D. Nature of a Fifth Amendment Takings Claim

 The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. As the Clause reflects, it does not prohibit the taking of property. Rather, it proscribes a taking without just compensation. *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 235, 123 S.Ct. 1406, 155 L.Ed.2d 376 (2003); *see also First English Evangelical Lutheran Church of Glendale v. County of L.A.*, 482 U.S. 304, 315, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). "Real property, tangible property, and intangible property all may be the subject of takings claims." *Conti v. United States*, 291 F.3d 1334, 1338–39 (Fed.Cir.2002) (citations omitted). The Court of Federal Claims possesses jurisdiction over takings claims against the United States. See *Murray v. United States*, 817 F.2d 1580, 1583 (Fed.Cir.1987); *Russell v. United States*, 78 Fed.Cl. 281, 289 (2007). "[A] party challenging governmental action as an unconstitutional taking bears a substantial burden." *E. Enters. v. Apfel*, 524 U.S. 498, 523, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998).

The United States Supreme Court ("Supreme Court") "has recognized that the government may 'take' private property by either physical occupation or regulation." *Tuthill Ranch, Inc. v. United States,* 381 F.3d 1132, 1135 (Fed.Cir.2004); *see also Yee v. City of Escondido, Cal.,* 503 U.S. 519, 522–23, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992). The analysis employed with respect to cases involving a physical occupation, "for the most part, involves the straightforward application of per se rules," whereas "regulatory takings jurisprudence ... is characterized by 'essentially ad hoc, factual inquires,' designed to allow 'careful examination and weighing of all the relevant circumstances.'" *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 322, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) (quoting *Penn Cent. Transp. Co. v. City of N.Y.,* 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)); see also *Yee,* 503 U.S. 519, 523, 112 S.Ct. 1522 (1992) ("The first category of cases requires courts to apply a clear rule; the second necessarily entails complex factual assessments of the purposes and economic effects of government actions.").

The United States Court of Appeals for the Federal Circuit ("Federal Circuit") "has developed a two-step approach to takings claims." *Boise Cascade Corp. v. United States,* 296 F.3d 1339, 1343 (Fed.Cir.2002). First, a plaintiff must identify the property interest that was allegedly taken. *Id.; see also Karuk Tribe of Cal. v. Ammon,* 209 F.3d 1366, 1374 (Fed.Cir.2000). Second, "[o]nce a property right has been established, the court must then determine whether a part or a whole of that interest has been appropriated by the government for the benefit of the public." *Members of Peanut Quota Holders Ass'n v. United States,* 421 F.3d 1323, 1330 (Fed.Cir.2005). Courts "do not reach this second step without first identifying a cognizable property interest." *Air Pegasus of D.C., Inc. v. United States,* 424 F.3d 1206, 1213 (Fed.Cir.2005).

Because the Trusts' only allege that a regulatory taking occurred, the court will limit its discussion to that body of case law. The Federal Circuit characterizes a regulatory taking as one in which "the government prevents the landowner from making a particular use of the property that otherwise would be permissible." *Forest Props., Inc. v. United States,* 177 F.3d 1360, 1364 (Fed.Cir.1999) (citing *Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 1014, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992)). Regulatory takings may be temporary or permanent, though these takings "'are not different in kind.' Both require compensation." *Kemp v. United States,* 65 Fed.Cl. 818, 823 n. 2 (2005) (quoting *First English,* 482 U.S. at 318, 107 S.Ct. 2378). Regulatory takings are divided into two categories: (1) categorical and (2) noncategorical. *Huntleigh USA Corp. v. United States,* 525 F.3d 1370, 1378 n. 2 (Fed.Cir.2008).

A categorical taking is one in which "all economically viable use, i.e., all economic value, has been taken by the regulatory imposition." *Palm Beach Isles Assocs. v. United States,* 231 F.3d 1354, 1357 (Fed.Cir.2000); *see also Lucas,* 505 U.S. at 1015, 112 S.Ct. 2886 (indicating that categorical treatment is appropriate "where regulation denies all economically beneficial or productive use of land"). Thus, "when the owner of real property has been called upon to sacrifice all economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." *Lucas,* 505 U.S. at 1019, 112 S.Ct. 2886. A categorical taking, like a permanent physical invasion of property, is deemed a *per se* taking under the Fifth Amendment. See *Lingle v. Chevron U.S.A., Inc.,* 544 U.S. 528, 538, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005).

A noncategorical taking "fall[s] short of eliminating all economically beneficial use of property." *Consumers Energy Co. v. United States,* 84 Fed.Cl. 152, 156 (2008) (citing *Palazzolo v. Rhode Island,* 533 U.S. 606, 617, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001)). A noncategorical taking is the "consequence of a regulatory imposition that prohibits or restricts only some of the uses that would otherwise be available to the property owner, but leaves the owner with substantial viable economic use...." *Palm Beach,* 231 F.3d at 1357. "Where a regulation places

limitations on land that fall short of eliminating all economically beneficial use, a taking nonetheless may have occurred, depending on a complex of factors. . . ." *Palazzolo,* 533 U.S. at 617, 121 S.Ct. 2448 (citing *Penn Cent.,* 438 U.S. at 124, 98 S.Ct. 2646). The Supreme Court in *Penn Central* extrapolated from prior decisions "factors that have particular significance," namely: (1) the economic impact of the regulation on the plaintiff; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action. 438 U.S. at 124, 98 S.Ct. 2646; *see also Lingle,* 544 U.S. at 540, 125 S.Ct. 2074 (stating that the *Penn Central* inquiry "turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests"). Such a test for regulatory takings requires a comparison of "the value that has been taken from the property with the value that remains in the property. . . ." *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 497, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987). While the Supreme Court's regulatory takings jurisprudence "cannot be characterized as unified," courts "aim[ ] to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Lingle,* 544 U.S. at 539, 125 S.Ct. 2074.

## IV. DISCUSSION

Defendant raises two jurisdictional defenses: (1) 28 U.S.C. § 1500 ("§ 1500") divests this court of jurisdiction because plaintiffs have a suit pending in a district court that is based on the same set of operative facts; and (2) plaintiffs have raised a tort claim, not a takings claim, and as a result, this case must be dismissed. On the merits, defendant argues that the government has taken no action with respect to the Range Property to give rise to a Fifth Amendment taking, and even if the government had, the Trusts have not established that the government has effected a categorical or noncategorical taking. The court addresses each of these arguments below. With respect to the jurisdictional defenses, the court finds that neither of them

has merit, and therefore, rejects them. With respect to the merits, the court finds that there are no genuine issues of material fact and proceeds to address the arguments in the parties' cross-motions, ultimately holding that plaintiffs have not established that the government's action amounted to a categorical or noncategorical taking.

### A. The Trusts' Amended Complaint Is Not Barred By § 1500

The court holds that § 1500 does not mandate the dismissal of the Trusts' amended complaint because the Trusts' action was filed in this court before the Trusts filed suit in the district court. Both the plain meaning of the statute as well as ample case law support the court's holding.

Defendant asserts that § 1500 deprives this court of jurisdiction over the Trusts' amended complaint because the Trusts have "another suit 'for or in respect to' th[is] claim pending against the United States or its agents." Cross–Motion 19 (quoting § 1500). In particular, defendant states that the Trusts have pending a complaint against the United States in the United States District Court for the Eastern District of Louisiana and in this court, and both complaints "are premised on the United States' allegedly damaging investigation and public notification of a potential explosive threat on Plaintiffs' property." *Id.* As a result, defendant argues, the Trusts' "factual allegations both here and in the district court are substantively identical," and consequently, "Section 1500 divests this Court of subject-matter jurisdiction." *Id.* at 20 (emphasis omitted). Defendant further asserts that it "makes no difference" that the Trusts filed their "complaint in this case prior to filing [their] district court complaint." *Id.* Acknowledging that decisions from the Court of Federal Claims have applied the "order of filing rule" recognized in *Tecon Engineers, Inc. v. United States,* 343 F.2d 943 (Ct.Cl.1965), which held that the subsequent filing of a complaint in a district court does not deprive this court of jurisdiction, defendant claims that the Supreme Court's decision in *United States v. Tohono O'odham Nation,* ___ U.S. ___, 131 S.Ct. 1723, 179 L.Ed.2d 723 (2011), "sufficiently undermined [the order-of-filing] rule

such that *Tecon* is no longer binding authority on this Court." Cross–Motion 20–21.

The Trusts, however, assert that § 1500 does not deprive this court of jurisdiction over its amended complaint because it filed its complaint in this court before instituting suit in the district court. According to plaintiffs, the Supreme Court's *Tohono* decision did not squarely address the order-of-filing rule established by *Tecon*. Therefore, the Trusts argue, the *Tecon* order-of-filing rule, which provides that § 1500 does not bar a first-filed suit in this court, remains binding law. As explained below, based upon the plain language of the statute and the decisions from the Federal Circuit, *Tecon's* "order-of-filing" rule remains valid.

### 1. The Plain Meaning of § 1500 Requires the Court to Deny Defendant's Motion

 First, § 1500 clearly states that this court retains jurisdiction unless the plaintiff has a suit "pending" in another court against the United States:

> The United States Court of Federal Claims shall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee *has pending* in any other court any suit or process against the United States or any person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, directly or indirectly under the authority of the United States. [16]

28 U.S.C. § 1500 (emphasis & footnote added). It is well settled that the starting point for statutory interpretation is the plain meaning of the text. See *Sharp v. United States*, 580 F.3d 1234, 1237 (Fed.Cir.2009); *Angus Chem. Co. v. United States*, 140 F.3d 1478, 1484 (Fed.Cir.1998). And based on the plain meaning of § 1500, if the Trusts had a suit "pending" against the United States in another court, this court would lack jurisdiction. The Trusts filed their complaint before

this court on January 5, 2010, and filed their complaint in the district court over one year later, on June 13, 2011. Given that jurisdiction in a case is determined as of the date a case is filed, it follows that because the Trusts' district court case was not "pending" at the time it filed its complaint in this court, § 1500 does not require dismissal of the Trusts' amended complaint before this court. See *Keene*, 508 U.S. at 207, 113 S.Ct. 2035; *Otoe–Missouria Tribe of Indians, Okla. v. United States*, 105 Fed.Cl. 136, 139 (2012).

### 2. The Tecon Order–of–Filing Rule Remains Good Law

In *Tecon*, the United States Court of Claims ("Court of Claims") held that § 1500 was meant to "prevent this court from taking jurisdiction of a claim only when the same plaintiff already 'shall have commenced and has pending' another suit on the same claim in another court." 343 F.2d at 949 (quoting a prior version of § 1500); *see also id.* (holding that § 1500 "serves to deprive this court of jurisdiction of any claim for or in respect to which plaintiff has pending in any other court any suit against the United States, only when the suit shall have been commenced in the other court before the claim was filed in this court."). Years later, the Federal Circuit in *UNR Industries, Inc. v. United States*, 962 F.2d 1013 (Fed.Cir.1992), repudiated *Tecon*. That case was taken on certiorari by the Supreme Court in *Keene* and affirmed. 508 U.S. at 200, 113 S.Ct. 2035. The Supreme Court in *Keene*, however, found "it unnecessary to consider, much less repudiate, the 'judicially created exceptions' to Section 1500 found in *Tecon*." *Id.* at 216, 113 S.Ct. 2035. Soon after, the Federal Circuit made it clear that *Tecon* "remains good law and binding on this court." *Hardwick Bros. Co. II v. United States*, 72 F.3d 883, 886 (Fed.Cir.1995); *see also Loveladies*, 27 F.3d at 1548–49 & n. 10.

Defendant, nonetheless, argues that the Supreme Court's decision in *Tohono* in 2011 "leaves little room for doubt that *Tecon* is no

---

16. The Supreme Court has held that two cases are "for or in respect to" the same claim if they are based on the same set of operative facts. See *Keene Corp. v. United States*, 508 U.S. 200, 201, 211, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993). Here, the court does not need to determine whether plaintiffs' case before this court and the district court case are based on the same set of operative facts. Even assuming that the cases arise from the same set of operative facts, § 1500 would not bar the amended complaint before this court for the reasons explained below.

longer good law, assuming it ever was." Cross-Motion 20 n. 16 (citing 131 S.Ct. at 1723). Defendant reads a holding into *Tohono* that does not exist. In *Tohono*, the Supreme Court unequivocally declared that the "*Tecon* holding is not presented in this case because the [Court of Federal Claims] action here was filed after the District Court suit." 131 S.Ct. at 1729–30; *see also id.* at 1735 n. 5 (Sotomayor, J., concurring) ("As the majority notes, ... the validity of the Court of Claims holding in [*Tecon*] is not presented in this case. This Court has never considered that holding."). Therefore, *Tohono* did not impact *Tecon's* order-of-filing rule.

Even though defendant acknowledges that *Tohono* "did not expressly overrule" *Tecon* because the "relevant procedural posture was not presented before the Court," defendant argues that the Supreme Court's dicta regarding *Tecon* is nonetheless binding on this court. CrossMotion 20 n.16. In support of its contention, defendant relies upon two Federal Circuit decisions that explain that the court is not free to ignore Supreme Court dicta. *Id.* (citing *Ins. Co. of the W. v. United States*, 243 F.3d 1367, 1372 (Fed.Cir.2001); *Stone Container Corp. v. United States*, 229 F.3d 1345, 1349–50 (Fed.Cir.2000), *cert. denied*, 532 U.S. 971, 121 S.Ct. 1601, 149 L.Ed.2d 468 (2001)). The merits of defendant's proposition need not be addressed because its argument is based on a false premise. There is no dicta in *Tohono* regarding the *Tecon* holding; consequently, there is no binding dicta. See *Kaw Nation of Okla. v. United States*, 103 Fed.Cl. 613, 619 n. 6 (2012).[17] Indeed, in its *Tohono* decision, the Supreme Court stated that *Tecon* was not disturbed. Clearly, then, defendant's dicta argument lacks merit and is rejected.

Defendant's rejection of *Tecon's* order of filing rule cannot withstand scrutiny for another reason: it has not been accepted by the Federal Circuit. Although *Tecon* was not specifically mentioned in the Federal Circuit's recent decision in *Central Pines Land Co. v. United States*, 697 F.3d 1360 (Fed.Cir. 2012), the Federal Circuit reaffirmed that a time-of-filing rule applied, which meant that whether the Court of Federal Claims possessed jurisdiction for purposes of § 1500 was "dependent on the state of things when the action was brought, and cannot be rescued by subsequent action of either party or by resolution of the co-pending litigation." *Id.* at 1367.

Further, the court notes that defendant has previously advanced the argument that *Tecon* is no longer good law before other judges of the Court of Federal Claims. In each instance, the argument was rejected as flawed, and it will not be accepted now. *See Otoe–Missouria Tribe*, 105 Fed.Cl. at 139 ("The Court rejects Defendant's argument once again ... and holds that *Tecon* is still good law and has not been overturned."); *United Keetoowah Band of Cherokee Indians in Okla. v. United States*, 104 Fed.Cl. 180, 184 (2012) ("[T]he *Tohono O'odham* majority 'stated clearly' that *Tecon* is not disturbed."); *Kaw Nation*, 103 Fed.Cl. at 617 ("Despite defendant's claims, it is abundantly clear that *Tohono* did not expressly overrule *Tecon*."); *Yakama Nation Hous. Auth. v. United States*, 102 Fed.Cl. 478, 484 (2011) ("[T]he *Tohono O'odham* court neither considered nor overruled *Tecon* in its application of § 1500."); *Coeur d'Alene Tribe v. United States*, 102 Fed.Cl. 17, 25 (2011) ("The *Tohono* Court, however, declined to either overrule or explicitly endorse *Tecon's* order-of-filing rule, and it did not indicate otherwise that Tecon is no longer good law."); *Nez Perce Tribe v. United States*, 101 Fed.Cl. 139, 145 (2011) ("The [*Tohono*] decision explicitly leaves undisturbed the *Tecon* timing rule.").

Therefore, consistent with the Supreme Court in *Tohono* and Federal Circuit case law, and in keeping with the holdings of other judges of the Court of Federal Claims, this court rejects defendant's arguments and holds that *Tecon* remains good law. As a result, the court denies defendant's motion to dismiss the Trusts' amended complaint for lack of jurisdiction pursuant to § 1500.

17. Defendant argues that there are several flaws in *Kaw Nation*. The court finds none of defendant's arguments persuasive.

## B. The Trusts' Amended Complaint Does Not Raise Allegations of Tort

■ Defendant next argues that plaintiffs have raised a tort, not a takings, claim, and as a result, this court lacks jurisdiction pursuant to the Tucker Act, 28 U.S.C. § 1491. The Federal Circuit in *Jan's Helicopter Service, Inc., v. FAA*, 525 F.3d 1299 (Fed.Cir. 2008), announced the appropriate standard as follows:

> In determining whether the Court of Federal Claims has jurisdiction, all that is required is a determination that the claim is founded upon a money-mandating source and the plaintiff has made a nonfrivolous allegation that it is within the class of plaintiffs entitled to recover under the money-mandating source. There is no further jurisdictional requirement that the court determine whether the additional allegations of the complaint state a nonfrivolous claim on the merits.

*Id.* at 1309. The Federal Circuit further stated that it "is undisputed that the Takings Clause of the Fifth Amendment is a money-mandating source for purposes of Tucker Act jurisdiction." *Id.* Here, the court finds that the Trusts have made nonfrivolous allegations that they are within the class of plaintiffs entitled to recover under the Fifth Amendment, and as a result, the court finds that it has jurisdiction, contrary to defendant's assertions discussed below, over the amended complaint. Indeed, when deciding a motion to dismiss, the court must assume all factual allegations set forth in the complaint are true and must draw all reasonable inferences in the Trusts' favor. See *Scheuer*, 416 U.S. at 236, 94 S.Ct. 1683.

### 1. The Trusts Do Not Raise Slander of Title Allegations

In its cross-motion, defendant asserts that the Trusts essentially claim that the Corps' written findings about the potentially unsafe condition of a portion of their property within the Range have deprived the Trusts of economic opportunity and caused a decrease in the value of the Range Property. Defendant states that the Trusts' claim is known by "a variety of names– slander of title, trade libel, slander or disparagement of property, injurious falsehood, disparagement of goods, product disparagement, disparagement of quality, commercial disparagement, or slander of goods." Cross–Motion 23 (citing several secondary sources). Defendant argues that regardless of the label applied to plaintiffs' claims, all of the causes of action sound in tort.

The court will consider each of the secondary sources defendant relies upon to support its slander of title argument. It first turns to the legal encyclopedia *Corpus Juris Secundum*, which defines "injurious falsehood," also known as "product disparagement" or "trade libel," as:

> the *knowing publication of matter falsely derogatory* to the plaintiff as to his or her property, its quality, his or her business in general, or some element of his or her personal affairs, of a kind calculated to prevent others from dealing with the plaintiff, or otherwise to interfere with his or her relations with others to his or her disadvantage. It is the publication of matter disparaging the quality of another's property, which the publisher should recognize is likely to cause pecuniary loss to the owner, or a statement discrediting the quality or utility of a producer's goods. It encompasses all false statements concerning the quality of services or product of a business which are intended to cause that business financial harm and in fact do so.

53 C.J.S. *Libel and Slander; Injurious Falsehood and Product Disparagement* § 311 (2005) (emphasis added) (footnotes omitted). As a preliminary matter, in examining the definition of product disparagement and its application here, the court notes that the amended complaint contains no allegation that the Corps knowingly published any matter that was "falsely derogatory" to the Trusts. Indeed, despite the reliance upon this specific authority, defendant has not identified where the Trusts have made such an allegation.

The *Corpus Juris Secundum* also defines "slander of title," which defendant asserts is the core of the Trusts' amended complaint:

> The tort of slander of title is almost identical to the tort of product disparage-

ment, the only difference being that slander of title involves aspersing the quality of one's title to property, while product disparagement involves aspersing the quality of one's property. An action for product disparagement is designed to protect the owner's interests in the vendibility of his or her products. While an injurious falsehood may concern the title to property, the gist of the action is some interference with an economically advantageous relationship which results in pecuniary loss rather than an action that directly affects property.

*Id.* (footnotes omitted). Here, too, defendant has failed to establish how the Trusts' allegations meet the definition of slander of title. Indeed, it cannot. There is not even a remote suggestion to be found in either of plaintiffs' pleadings that defendant made false statements that raise concerns about the Trusts possessing clear title to the property that directly lead to plaintiffs' financial loss.

Defendant next relies upon another secondary source for the definition of "trade libel," stating that trade libel is the " 'publication of any false or malicious statement.... ' " Cross–Motion 23 (emphasis added). In fact, this secondary source states:

> "Trade libel" identifies the tort addressing aspersions cast upon one's business operation. As a general rule, *the publication of any false and malicious statement* which tends to disparage the quality, condition, or value of the property of another, and which causes other special injury or damage, *is actionable as a trade libel, or as a slander or disparagement of property.*

50 Am.Jur.2d *Libel and Slander* § 527 (2011) (emphasis added) (footnotes omitted). Thus, defendant misquotes this secondary source, which, to apply, would require the Trusts to allege that the Corps had issued a publication of a "false and malicious" statement. In any event, based upon the court's review of the allegations of the amended complaint coupled with defendant's failure to cite to any allegation therein, it is apparent that the Trusts do not allege that the government published a "false and malicious statement." Indeed, while plaintiffs complain about the FUDS designation and the release of the Final SI Report, alleging that these government actions have resulted in a diminution in property value, they do not allege that the government made false and malicious statements or acted in a malicious manner.

Finally, defendant cites Section 626 of the Second Restatement of Torts to support its argument that the Trusts' allegations rise to the tort of "injurious falsehood," which is defined as the " 'publication of matter disparaging the quality of another's land ..., that the publisher should recognize as likely to result in pecuniary loss to the other through the conduct of a third person in respect to the other's interests in the property.' " Cross–Motion 23 (quoting Restatement (Second) of Torts § 626 (1977)). Although at first blush it appears that defendant may have a point, in fact, defendant did not provide the complete definition. Section 626 of the Second Restatement of Torts, "Disparagement of Quality–Trade Libel," states:

> The rules on liability for the publication of an injurious falsehood stated in § 623A apply to the publication of matter disparaging the quality of another's land, chattels or intangible things, that the publisher should recognize as likely to result in pecuniary loss to the other through the conduct of a third person in respect to the other's interests in the property.

Restatement (Second) of Torts § 626. Thus, Section 626 references the rules on liability for the publication of an injurious falsehood in Section 623A, which defendant fails to mention. Section 623A, "Liability for Publication of Injurious Falsehood–General Principle," provides:

> One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if
>
> (a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, *and*
>
> (b) *he knows that the statement is false or acts in reckless disregard of its truth or falsity.*

*Id.* § 623A (emphasis added). Here, as well, defendant has not cited, nor has the court identified, any allegation in the amended complaint whereby the Trusts aver that with respect to the property, the Corps knowingly made and/or published a false statement to diminish plaintiffs' property value or acted in reckless disregard of its truth or falsity. Therefore, defendant's theory is without merit.

The government also directs the court's attention to case law, relying upon the facts of *Davis v. United States,* 35 Fed.Cl. 392 (1996), which defendant argues are analogous to the case sub *judice.* In *Davis,* the plaintiffs filed a claim for a Fifth Amendment taking, alleging that the government improperly disseminated a study and allowed a government official to comment on the plaintiffs' property, thereby stigmatizing and forever branding their property as "unsafe for any use involving human habitation." *Id.* at 394. The study issued by the government defined restrictions on land uses in the vicinity of air installations to assure compatibility with installation operations and to ensure that individuals and facilities would not be concentrated in areas susceptible to aircraft accidents. *Id.* The study also established a "Clear Zone" prohibiting, among other things, residential and commercial uses of property within this zone, and a portion of the plaintiffs' property fell within the Clear Zone. *Id.* Approximately one month later, the government denied that the plaintiffs' property fell within the Clear Zone, and months later, the government issued a statement noting the preliminary nature of the study and that it was in the process of withdrawing previously distributed copies of the study. *Id.*

The *Davis* court agreed with defendant that the plaintiffs' complaint asserted the tort of slander of title, rather than a taking, and as a result, the complaint was outside of the court's jurisdiction. *Id.* Relying on Section 624 of the Second Restatement of Torts, it defined slander of title as the " 'publication of a false statement disparaging another's property rights in land ... that the publisher should recognize as likely to result in pecuniary harm....' " *Id.* at 395 (quoting Restatement (Second) of Torts § 624). As a result, the *Davis* court concluded that the plaintiffs'

allegation that the government's premature public release of a study and public statements, stigmatizing the plaintiffs' property and consequently depreciating its value, met the definition of slander of title. *Id.*

In the court's view, *Davis* does not support defendant's jurisdictional argument. Indeed, the facts in *Davis* stand in stark contrast to the facts of this case. As explained previously, the Trusts have not argued that the government made a false statement disparaging the Range Property. In *Davis,* the precise opposite was true–the plaintiffs alleged that a government official made false statements that destroyed property values and issued an inaccurate study that was later withdrawn. Moreover, in *Davis,* the study disseminated by the government was advisory in nature, and as a result, could not be sufficiently intrusive as to amount to a taking. In this litigation, the Trusts assert that the Range Property's assignation as a FUDS is not merely advisory in nature, but rather, carries real consequences for the Trusts. Indeed, the Trusts have asserted that, the Corps, acting pursuant to the DERP, the FUDS program, and the DERP regulations, produced the Final SI Report that concluded that there is a potential for an explosive safety risk, and this resulted in either a categorical taking, or in the alternative, a noncategorical regulatory taking. Therefore, defendant's argument that the Trusts' allegations amount to slander of title, which requires, *inter alia,* the publication of a false statement, is not persuasive under the facts of this case.

### 2. The Trusts' Allegations Do Not Otherwise Sound in Tort

In the alternative, defendant asserts that the Trusts' claim "may also be deemed to assert the tort of basic negligence." Cross–Motion 24. Defendant claims it is not the Corps' findings regarding the potentially unsafe condition of the Range that can be said to have interfered with the Trusts' sale or development of the Range Property, but rather, it is the actual risk of UXO that has caused this interference, assuming any interference has occurred. Defendant argues that the risk has run with the Range Proper-

ty for over the last sixty years, the Trusts and its agents have long known that the Range Property was used as a bombing range, and, consequently, the risk of explosive harm was not made worse by the Corps' mere issuance of a report.

■ The Federal Circuit's decision in *Ridge Line, Inc. v. United States*, 346 F.3d 1346 (Fed.Cir.2003), describes the "line distinguishing potential physical takings from possible torts" as drawn by a two-part inquiry:

> First, a property loss compensable as a taking only results when the government intends to invade a protected property interest or the asserted invasion is the "direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action." Second, the nature and magnitude of the government action must be considered. Even where the effects of the government action are predictable, to constitute a taking, an invasion must appropriate a benefit to the government at the expense of the property owner, or at least preempt the owner[']s right to enjoy his property for an extended period of time, rather than merely inflict an injury that reduces its value.

*Id.* at 1355–56 (citations omitted).

Applying the standard announced in *Ridge Line*, defendant states that it is apparent that the Army did not leave any residual ordnance on the Range or the Range Property intentionally, and even if the Army failed to remove all remnants of ordnance, this failure cannot reasonably be said to have secured a benefit to the government. Defendant argues that, at best, the failure to properly dispose of a safety risk is a claim of negligence, and as a result, the court lacks jurisdiction. The Trusts respond to defendant's argument that it is the potential risk of UXO that is the real basis of plaintiffs' claim, rather than the Corps' findings, by noting that the Range Property has been used for over sixty years without incident. The Trusts argue that it was not until the application of the FUDS program that the presence of potentially hazardous munitions and explosives of concern was suspected or

confirmed. The Trusts additionally contend that defendant's argument ignores portions of the *Ridge Line* test. That is, defendant does not address whether the invasion of the Trusts' property rights is the direct, natural, or probable result of an authorized activity (the application of the FUDS program), nor does defendant address whether the owner's rights are preempted.

With respect to the first part of the two-part inquiry, it cannot be said, nor do the Trusts argue, that defendant intentionally invaded the Range Property. The Federal Circuit has further explained that under the first part of the two-part test, "a property owner must prove that the asserted government invasion of property interests allegedly effecting a taking 'was the predictable result of the government action,' either because it was 'the direct or necessary result' of the act or because it was 'within contemplation of or reasonably to be anticipated by the government.'" *Vaizburd v. United States*, 384 F.3d 1278, 1282 (Fed.Cir.2004) (quoting *Ridge Line*, 346 F.3d at 1356). At this juncture, the court is not deciding whether a taking occurred, but rather is deciding whether plaintiffs have sufficiently alleged a taking rather than a tort claim such that this court has jurisdiction to proceed to the merits. The Trusts have alleged that the authorized government activity is the application of the FUDS program, and that the Corps' application of the FUDS program has resulted in findings in the Final SI Report that a potential explosive safety risk exists at three of the five sites within the Range. Moreover, the Trusts have alleged that the elimination of all economically viable uses of the Range Property is the direct, natural, and probable result of the Corps' application of the FUDS program.

Plaintiffs also contend that the harm was predictable or foreseeable. They assert that it is common sense that if the government issues a report stating that an area of land may contain munitions and explosives of concern then the land value of that parcel would be significantly, if not entirely, reduced. Moreover, they argue that, at the least, the Corps was made aware by property owners that property values had been compromised.

Thus, plaintiffs argue that it is reasonable to conclude that the alleged elimination of economically viable uses of the Range Property was the result of the Corps' Final SI Report. Because the Trusts have raised a nonfrivolous allegation that the government regulations and resulting Final SI Report resulted in the elimination of all economically beneficial uses of the Range Property, the Trusts have satisfied the first part of the Federal Circuit's two-part inquiry.

With respect to the second part of the *Ridge Line* inquiry, defendant only argues that the government did not secure a benefit from the alleged taking. At this juncture, the court is not prepared to accept that there is no benefit to the government for an agency to have access to a landowners' property to fulfill its statutory mission or further a publicly stated policy objective, such as the Army's removal of its UXO from public and private property. Moreover, the court does not find defendant's *Ridge Line* test analysis persuasive because it entirely ignores the remainder of the second prong of the *Ridge Line* test that instructs that to constitute a taking, "an invasion must ... *at least preempt the owner[']s right to enjoy his property for an extended period of time,* rather than merely inflict an injury that reduces its value." 346 F.3d at 1356 (emphasis added). At the very least, the Trusts have alleged that the Corps' actions have preempted the Trusts' right to enjoy the Range Property for an extended, and possibly unknown, period of time since the remedial investigation/feasibility study will not occur until at least 2019.

 Thus, the court concludes that the Trusts have, at a minimum, raised allegations in the nature of a Fifth Amendment constitutional violation rather than sound in tort. Whether the Trusts have demonstrated that the government did in fact effect a taking, however, is an entirely separate issue, which is discussed below.

**18.** As discussed below, the Trusts argue that only the Range Property is the relevant property at issue, while the government argues that under the "parcel-as-a-whole" rule, the Trusts' property outside of the Range must also be considered in

## C. The Trusts Have Not Demonstrated That a Taking Has Occurred

As noted above, in order to establish a taking, a plaintiff must first identify the property interest that was allegedly taken. *Lucas,* 505 U.S. at 1030–31, 112 S.Ct. 2886; *see also Fla. Rock Indus., Inc. v. United States,* 45 Fed.Cl. 21, 27 (1999) (stating that the initial step in the takings inquiry is to determine whether the plaintiff has a compensable property interest). Once a property right has been established, the court must then determine whether a part or a whole of that interest has been "appropriated by the government for the benefit of the public." *Members of Peanut Quota Holders Ass'n,* 421 F.3d at 1330. As a result, the court considers first whether the Trusts have a compensable interest in the Range Property before turning to whether a government action has taken that interest.

### 1. The Trusts Have Not Established That They Have a Compensable Property Interest That Was Taken by Government Action

#### a. The Trusts Have Established a Valid Property Interest

 Property rights are established under state law. *See, e.g., Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.,* —— U.S. ——, 130 S.Ct. 2592, 2597, 177 L.Ed.2d 184 (2010). Here, it is not disputed that the Trusts own approximately 11,200 acres inside of the Range and own an additional 7,000 acres outside of the Range, some of which are contiguous to the property inside of the Range. [18] Therefore, the court finds that the Trusts have demonstrated that they own a property interest that they aver the government has taken without just compensation.

#### b. The Trusts Have Not Established That a Government Action Has Interfered With Their Property Interest

Where a categorical or noncategorical taking is alleged, the Supreme Court's analysis

the analysis. For the sake of this discussion, the court assumes that the relevant area is the Range Property, since this area, along with other land within the Range not owned by the Trusts, is the area that received the FUDS designation.

begins with the premises that the government has exercised its regulatory authority and that authority interfered with the plaintiff's right to enjoy its property. See *Lucas,* 505 U.S. at 1014–15, 112 S.Ct. 2886; *Penn Cent.,* 438 U.S. at 123–24, 98 S.Ct. 2646. Therefore, before turning to whether the Trusts have suffered a categorical or non-categorical taking, the court first analyzes whether the government exercised its regulatory authority in a manner that interfered with the Trusts' right to enjoy their property.

The Trusts assert that the DERP and the John Warner National Defense Authorization Act for Fiscal Year 2007 provide the statutory authority, and the Corps' actions, in carrying out the DERP, FUDS, and/or military munitions response programs, effect a taking. The Trusts rely largely on the issuance of the Final SI Report in arguing that defendant should have known that conclusions made in the report would negatively impact property values. Plaintiffs also rely on a DoD manual to argue that the Range Property is subject to government-imposed restrictions.

 With respect to the Final SI Report, the Trusts have not established that its issuance in any way restricted their right to enjoy the Range Property. The Final SI Report stated that no munitions and explosives of concern were located on the Range "but two [munitions debris] items were observed," and that historical data and the presence of munitions debris at the site suggested there was a "potential" for munitions and explosives of concern to be present at some of the sites. Def.'s Ex. C at USA000180. Thus, the Final SI Report concluded that there was a *"possibility* that human receptors might come into contact with explosively hazardous [munitions and explosives of concern]" at three of the five sites. *Id.* at USA000176 (emphasis added). Defendant, however, argues that the mere issuance of this Final SI Report by the government, without the government also asserting invasive or controlling authority over the property, cannot effect a taking. Because the Final SI Report merely raised the possibility of the presence of some hazardous

UXO at three of the five sites, rather than stigmatizing the property as "unsafe for any use involving human habitation," as was the case in *Davis,* 35 Fed.Cl. at 394, the court agrees.

The Trusts claim that prior to 2008, they had not been notified or otherwise informed of any UXO being found on the Range Property. The Final SI Report, however, did not conclude that UXO were present. It merely stated that there was a risk of UXO being found on the Range Property. More to the point, plaintiffs have always known of the Range Property's prior use as a bombing range, as well as the presence of bomb fragments, practice bombs, and shell casings on the Range Property. For instance, Mr. Schneider, one of plaintiffs' trustees, recalled that the Range Property was commonly referred to as "the bombing range." In addition, individuals who had worked on the Range Property, some for as long as forty years, stated that they had observed sand-filled practice bombs, small bombs, and small arms projectiles. Finally, the Trusts have not pointed to any language in the Final SI Report that restricts their access to or use of the Range Property in any way. Thus, the Corps' recommendation for further investigation based on the Final SI Report's finding that there is the potential for explosive risk does not satisfy the threshold "government action" requirement to establish a taking.

 The Trusts also assert that the government, in effect, controls the Range Property. In support of this argument, plaintiffs allege that certain DoD restrictions apply to properties known or suspected to contain munitions and explosives of concern. Specifically, the Trusts argue that a DoD manual– DoD Ammunition and Explosives Safety Standards, No. DoD 6055.09–M, Vol. 7, February 29, 2008, reissued August 4, 2010– places restrictions on the Range Property. Pls.' Ex. F. For example, the Trusts claim that under the standards set forth in the manual ("Safety Standards"), the DoD cannot allow individuals to access real property suspected to contain munitions; that access to these areas is limited to specified personnel; that construction in these areas is prohibited; and that the property may not be

sold. For the reasons explained below, the Trusts are mistaken.

The Safety Standards, upon which plaintiffs rely, do not apply to FUDS such as the Range Property, which by their definition are not under the DoD's control. Consequently, plaintiffs rely on standards that have no application to the Range Property. Indeed, the Safety Standards cited by plaintiffs apply only to current DoD sites and to DoD Components, such as the Corps. The Trusts cite the following section of the Safety Standards as purported proof that the government is required to restrict access to the Range Property: "Prohibit unnecessary access (e.g., livestock grazing, recreational uses such as hunting and hiking) and take appropriate action to deter unauthorized access to areas under DoD control that are known or suspect to contain UXO." Pls.' Ex. F § V7.E3.5.1. This phrase, the Trusts claim, states that "unnecessary access" is prohibited at any site known or suspected to contain UXO, regardless of whether it is under DoD control, and "areas under DoD control" modifies only the phrase "take appropriate action to deter unauthorized access." The Trusts misread the provision, and offer no support for their assertion that "under DoD control" does not apply to "[p]rohibit unnecessary access" as well– that is, the court reads this provision to state that the government must prohibit unnecessary access to areas under DoD control. Moreover, because there is another provision regarding access that clearly applies only to FUDS, the court rejects the Trusts' reading that section V7.E3.5.1 applies to FUDS.

Specifically, under the section titled "V7.E3.5. ACCESS TO AREAS KNOWN OR SUSPECTED TO CONTAIN UXO," the Safety Standards state:

> To ensure explosives and [chemical agents] safety risk is identified and controlled on real property currently or formerly under the jurisdiction, custody, or control of a DoD Component, the DoD Components must:
>
> . . .
>
> V7.E3.5.2. *When the Department of Defense does not control the area (e.g.,*

*FUDS)*, at a minimum, provide written notification to the property owner and, if known, any tenants of the potential explosive and CA hazards present. A record of this notification must be maintained in permanent records.

Pls.' Ex. F § V7.E3.5 (emphasis added). Therefore, for a FUDS such as the Trusts', the Safety Standards only require the Corps to issue written notification. If the Trusts' assertion that the Safety Standards require the Corps to restrict access to the Range Property under section V7.E3.5.1 was correct, it would be redundant to include an additional, separate designation for FUDS as the Safety Standards do in section V7.E3.5.2.

Moreover, the Safety Standards also distinguish the government's obligations for a FUDS when an area is known or suspected to contain munitions and explosives of concern or chemical agents:

> V7.E4.2. EXPLOSIVES SAFETY STANDARDS FOR THE IDENTIFICATION AND CONTROL OF AREAS KNOWN OR SUSPECTED TO CONTAIN [MUNITIONS AND EXPLOSIVES OF CONCERN] OR [CHERMICAL AGENTS]. To ensure explosives and [chemical agents] safety risk is identified and controlled on real property currently or formerly under the jurisdiction, custody, or control of a DoD Component, the DoD Components must:
>
> . . .
>
> V7.E4.2.3. *When the Department of Defense does not exercise jurisdiction, custody, or control over the area (e.g., FUDS)*, the responsible DoD Component shall, at a minimum, provide written notification of the potential explosive or CA hazards to the property owner and any known tenants. A record of this notification must be maintained as a permanent record. (See paragraph V7.E4.2.2.)

*Id.* § V7.E4.2 (emphasis added). Thus, the Trusts have not offered evidence that the Safety Standards, or any regulations, direct or impose controls on the Range Property.

In addition, the Corps has not prohibited the Trusts from using the Range Property in any manner, nor has the Corps restricted or attempted to restrict the Trusts' use of the Range Property. For instance, when asked by representatives of the Trusts whether they should change their activities on the Range Property, the Corps left that decision to plaintiffs by specifically stating it could not offer advice. The Corps also told the Trusts that the Corps "could not give [them] any specific instructions about how [they] were to use the property." Def.'s Ex. G at 107:6–12. The Corps did not tell the Trusts that they could not develop or sell the property, but rather, only that a possible threat existed on the property that needed to be made public. It is important to recall that plaintiffs' grantor, their predecessor in interest and the individual who established the Trusts for their benefit, began acquiring various parcels of land in the 1950s that now compose the Range Property, knowing full well that the Range Property had been used, *inter alia,* as a bombing range. Family friend Judge Ford presented the parents of at least one of the current trustees with copies of his history of the area that detailed its use as a bombing range and acknowledged the presence of UXO on the Range Property. Thus, when plaintiffs acquired the Range Property with the UXO, its history was well known to the trustees and in the community. Moreover, defendant's exercise of its authority to identify potential UXO is appropriate under the statute and with the stated goal of removing UXO for public safety, is an appropriate use of the government's police powers. Although the Corps informed the Trusts that they would need to inform their tenants, the hunt club members, of the Corps' findings, the Corps did not tell the Trusts to cease leasing the property for hunting or for harvesting timber. In fact, the Trusts continued to lease land to the hunting club well after the Final SI Report was issued. Indeed, after the issuance of the June 2009 Final SI Report, the Trusts continued to lease 13,-563.53 acres of land to the South Tangipahoa Hunting Club for $54,254.12 per year. Moreover, the current uses for the Range Property include timber production and a hunting club's activities.[19]

Further, the FUDS regulations state that a project is "ineligible" for FUDS status "where the current owner refuses right of entry." Def.'s Ex. J at USA001283. These regulations also state that "failure to obtain an appropriate right-of-entry or interest in real estate before entering onto land for investigation or remediation can subject Government and contractor personnel to civil or criminal penalties for trespass. . . . [Government personnel] can ensure that the Government action is not prejudiced by a violation of landowner rights . . ." *Id.* at USA001450. Therefore, the Corps had to obtain the Trusts' permission, and the Trusts had to grant the Corps permission. Indeed, the Trusts permitted the government and its agent to enter the Range Property that ultimately allowed the Corps to produce the Inventory Project Report, the Archives Search Report, and the SI. The Trusts granted the Corps a revocable right of entry to conduct the SI and did not at any time communicate a desire to revoke that right. In fact, the Trusts wanted the Corps to conduct the SI on the Range Property, based upon their mistaken belief that the Range Property would not require any further investigation and remediation. Accordingly, the FUDS regulations do not constitute interference with plaintiffs' property interest.

Assuming that the FUDS designation and issuance of the Final SI Report establish some degree of governmental restriction or interference with the Range Property, the court finds, as discussed below, that such actions by the government do not rise to the level of a taking. Thus, the Trusts cannot establish that a categorical, or in the alternative, a noncategorical taking occurred.

---

19. As noted earlier, Ms. Connelley stated in her deposition in August 2011 that timber production and the lease of land to the hunting club had not been impacted, but Mr. Schneider, in an affidavit in November 2011, stated that no timbering activities are ongoing at the Range Property. At the very least, it is apparent that the Trusts leased land within the Range to the hunting club from September 2010 until August 2011, well after the Corps issued the Final SI Report in June 2009.

## 2. Plaintiffs Have Not Established That a Categorical Taking Has Occurred

 Even if plaintiffs could establish that government action had interfered with their property interest, they still would have to establish that taking was categorical, as alleged in the amended complaint. As discussed below, plaintiffs fail to meet this burden. In order for a taking to be considered "categorical," only a complete deprivation will suffice. *See, e.g., Lucas,* 505 U.S. at 1019 n. 8, 112 S.Ct. 2886; *Tahoe–Sierra,* 535 U.S. at 324, 330, 122 S.Ct. 1465 (describing a categorical taking as an "extraordinary circumstance" and a "narrow exception" to regulatory takings principles). If the government action does not deprive the owner of all beneficial use of the entire relevant parcel or the "parcel as a whole," then no categorical taking can be shown. *See Tahoe–Sierra,* 535 U.S. at 330–31, 122 S.Ct. 1465; *Appolo Fuels, Inc. v. United States,* 381 F.3d 1338, 1346 (Fed.Cir.2004). The court first turns to determining the relevant parcel for its takings analysis, and then discusses whether plaintiffs have shown a categorical taking–i.e., the alleged government action resulted in the Range Property losing all of its economically beneficial use.

### a. The "Parcel as a Whole" Includes More Than Just the Range Property

 As the Supreme Court explained in *Penn Central,* "[i]n deciding whether a particular governmental action has effected a taking, th[e] Court focuses ... both on the character of the action and on the nature and extent of the interference with rights in the *parcel as a whole ....* " 438 U.S. at 130–31, 98 S.Ct. 2646 (emphasis added). The "parcel-as-a-whole" rule can be explained to mean that " 'where an owner possesses a full "bundle" of property rights, the destruction of one "strand" of the bundle is not a taking.' " *Tahoe–Sierra,* 535 U.S. at 328, 122 S.Ct. 1465 (quoting *Andrus v. Allard,* 444 U.S. 51, 65–66, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979)). The Supreme Court has previously rejected property owners' attempts to "narrowly define certain segments of their property and assert that, when so defined, [the government action] denie[d] them economically viable use." *Keystone,* 480 U.S. at 497, 107 S.Ct. 1232. In asking a court "to compare the value that has been taken from the property with the value that remains in the property, one of the critical questions is determining how to define the unit of property 'whose value is to furnish the denominator of the fraction.' " *Id.* (citation omitted); *see also Tahoe–Sierra,* 535 U.S. at 331, 122 S.Ct. 1465 ("defining the property interest taken in terms of the very regulation being challenged is circular" and emphasizing that the Supreme Court has "consistently rejected such an approach to the 'denominator' question"). The court reviews relevant decisions below before turning to the case *sub judice.*

The Supreme Court in *Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust for Southern California,* 508 U.S. 602, 643, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993), rejected the plaintiff's effort to shoehorn its claim into the categorical takings analysis by asserting that its property was taken in its entirety. It made clear that its precedent instructed that a "claimant's parcel of property could not first be divided into what was taken and what was left for the purpose of demonstrating the taking of the former to be complete and hence compensable." *Id.* at 644, 113 S.Ct. 2264. The "relevant question ... is whether the property taken is all, or only a portion of, the parcel in question." *Id.*

The United States Claims Court ("Claims Court") in *Ciampitti v. United States,* 22 Cl.Ct. 310, 318 (1991), held that the "parcel as a whole" analysis requires a review of factors such "as the degree of contiguity, the dates of acquisition, the extent to which the parcel has been treated as a single unit, the extent to which the protected lands enhance the value of remaining lands, and no doubt many others would enter the calculus...." Depending on the facts of a case, one factor may be more compelling than another. *Id.* at 320. In *Ciampitti,* for example, the Claims Court found that the lack of contiguity between the parcels at issue was minimized by the fact that the property owner treated land that he argued should not be included in the "parcel as a whole analysis"

as inextricably linked, evidenced by the fact that the owner had used the parcel to be included for purposes of purchase and financing, and therefore, it "would be inappropriate to allow [the property owner] now to sever the connection he forged when it assists in making a legal argument." *Id.*

In *Forest Properties, Inc. v. United States*, 177 F.3d 1360, 1365 (Fed.Cir.1999), *aff 'g* 39 Fed.Cl. 56, 72–74 (1997), the Federal Circuit affirmed the Court of Federal Claims' relevant parcel analysis, which the trial court determined to be the full sixty-two-acre parcel owned by the property owner, rather than only the nine impacted acres the property owner claimed were relevant to the analysis. In that case, the property owner applied for a permit under the Federal Water Pollution Control Act of 1972, 33 U.S.C. §§ 1251–1387 (1994) ("Clean Water Act"), to dredge and fill approximately nine acres of lakebottom property, and the permit application described the project as a "total of 62 acres (9 acres of filled area)." 39 Fed.Cl. at 64–65. The Court of Federal Claims determined that the relevant parcel for the takings analysis was combined upland and lakebottom property that constituted real estate development, rather than the lakebottom property alone, based on contiguity of properties, temporal proximity of purchase of upland property and lakebottom option rights, and unity of use proposed by a real estate developer for the upland and lakebottom property.[20] *Id.* at 74.

Finally, the Federal Circuit in *Norman v. United States*, 429 F.3d 1081, 1091 (Fed.Cir. 2005), *aff'g* 63 Fed.Cl. 231, 259–61 (2004), held that the Court of Federal Claims correctly found that the "parcel as a whole" was "the 2280–acre" development, comprising the properties designated for development in Phases I, II, and III of the development plan, rather than the 220.85 acres of wetlands that the property owner alleged was taken by the government. The Federal Circuit explained that the analysis turned on the "critical issue" of "the economic expectations

of the claimant with regard to the property," and that " '[w]here the developer treats legally separate parcels as a single economic unit, together they may constitute the relevant parcel.' " 429 F.3d at 1091 (quoting *Forest Props.*, 177 F.3d at 1365). The record was clear that the property owners "themselves regarded the 2280–acre parcel as a single economic unit." *Id.* Moreover, the Court of Federal Claims found that it did not matter that portions of land were purchased at different times because the plaintiffs had "purchased these parcels for development of a planned and self-contained community...." 63 Fed.Cl. at 260.

■ The Trusts argue that some of the Range Property will be used for residential development while some will be used for commercial development, and as such, all of the property owned by the Trusts, inside and outside of the Range, should not be viewed as one parcel. The court believes this distinction is irrelevant. Regardless of the precise use, the Trusts' plan for all of its acreage is to develop a "mega site" with mixed use. Thus, the Trusts treat all of their landholdings as one unit to be developed on a large scale to maximize their return on investment. Accordingly, even though different parcels will be developed for different purposes, that does not permit the Trusts to carve out each distinct component of development as standalone parcels. To the contrary, the forgoing discussion of binding precedent compels the conclusion that the entire 18,000–plus acres be viewed as one unit. Plaintiffs' argument that they have the right to develop every square inch of their land to its maximum potential cannot withstand scrutiny. Viewing a large tract developed with multiple distinct uses as the parcel-as-the-whole is not new. For instance, in *Deltona Corp. v. United States*, 657 F.2d 1184, 1188, 1193 (Ct.Cl. 1981), plaintiff purchased a 10,000–acre parcel and created a plan that called for residential and commercial development, and the Court of Claims defined the relevant parcel

---

**20.** Because the Court of Federal Claims determined that the pertinent parcel in that case was the entire sixty-two-acre project (i.e., the fifty-three acres of upland property in conjunction with the approximately nine acres of lakebottom

land), it proceeded to use a noncategorical or a partial taking analysis since there was substantial value remaining in the total parcel at issue. *Forest Props.*, 39 Fed. Cl. at 75.

as the entire 10,000–acre parcel. *Id.* (stating that the "master plan called for more than 12,000 single family tracts, numerous multi-family sites, school and park areas, shopping districts, marinas, beaches[,] and regular utilities"). The Trusts assert that after approximately fifty years of using their property for timber harvesting, they were moving forward with development of all of that land inside and outside of the Range. The Trusts also rely on the fact that not all of the property was purchased on the same day. That fact is wholly irrelevant. The Trusts plan to develop all of the land, either for residential or commercial use. Moreover, some of the land in the Range owned by the Trusts runs contiguous to land that the Trusts own outside of the Range.[21]

Setting aside for a moment the fact that the Corps has not taken any invasive or controlling regulatory action, the Trusts' categorical takings claim fails because plaintiffs improperly focus on only the Range Property, at the exclusion of over 7,000 additional acres that the Trusts own outside of the Range. The Trusts, however, assert that several factors, such as those cited in *Ciampitti*, must be considered before the court can determine the relevant parcel, and that these factors favor the finding that its 7,000 acres outside of the Range should not be considered in the analysis.

Based upon the facts of this case, the court finds that the relevant parcel for the takings analysis is the 18,000–plus–acre tract owned by plaintiffs, not just the approximately 11,200 acres that are the subject of the FUDS designation as plaintiffs argue. Given the Supreme Court and Federal Circuit precedent outlined above, it is apparent that the Trusts' "investment-backed expectations" for the Range Property cannot be severed from their "investment-backed expectations" for property outside of the Range. Indeed, it appears that the Trusts treated property in the Range and outside of the Range as one economic unit. In this litigation, plaintiffs claim that they sought to develop their property both inside and outside of the Range. For instance, Mr. Schneider states that as part of the Trusts' efforts to achieve the highest and best use, the Trusts "commissioned a Tangipahoa/St. Tammany Strategic Land Plan for Trust property both in and around the Range in 2007." Pls.' Ex. A ¶ 24. As a result of the findings in the Strategic Land Plan, the Trusts' primary expectation was to develop a "mega site," which relied on property both inside and outside of the Range. The development of a "mega site" depended upon, among other things, the construction of a new interchange to connect to Interstate 12, which would have been located on plaintiffs' land outside of the Range. To support projects envisioned as part of plaintiffs' "mega site" and which would be constructed on land located both on and off of the Range, the Strategic Land Plan included wetlands delineations, the construction of the interchange to connect to Interstate 12, and the construction of one or more sewer treatment plants. Efforts to market the property inside and outside of the Range, south of Highway 190, "included various industrial, commercial, and residential development opportunities...." Pls.' Ex. A ¶ 27. Mr. Schneider also states that the Trusts had discussions with developers regarding property within the Range and just south of the Range– presumably, the land south of Highway 190 that is contiguous to the property inside of the Range north of the highway.

Having viewed its property, inside and outside of the Range, with the economic expec-

---

21. At a minimum, plaintiffs own property outside of the Range that is contiguous to their property owned inside of the Range, and as a result, the "denominator" is more than the 11,200 acres the Trusts have argued is relevant to the analysis. One of the trustees, Mr. Schneider, states that the Trusts own roughly 11,200 acres in the Range, which is located north of Interstate 12 and Highway 190. Mr. Schneider also states that the Trusts further own property south of Highway 190 "that is contiguous to the [Range] Property." Pls.' Ex. A ¶ 6. Indeed, the record contains a map that reflects land owned by the Trusts inside of the Range and some of the land owned outside of the Range, and the map shows that the Trusts own parcels north and south of Highway 190 that are contiguous. The parties have not identified how much land owned by the Trusts outside of the Range is contiguous to the property inside of the Range, but consideration of this fact alone mandates a finding that the relevant parcel is not simply the land inside of the Range.

tations for development, particularly of a "mega site," the Trusts cannot now segregate the Range Property from the Trusts' remaining property solely for the purposes of the takings analysis. Therefore, in evaluating whether a government action has destroyed all economically viable use of the Trusts' property, the relevant parcel is the Trusts' 18,000–plus acres located inside and outside of the Range.

### b. The Trusts Have Not Shown That No Economically Beneficial Use Remains

The Supreme Court announced in *Lucas* that a plaintiff has established a categorical taking in "the extraordinary circumstance when no productive or economically beneficial use of land is permitted." 505 U.S. at 1017, 112 S.Ct. 2886 (emphasis added). "[W]hen the owner of real property has been called upon to sacrifice all economically beneficial uses in the name of the common good, that is, *to leave his property economically idle*, he has suffered a taking." *Id.* at 1019, 112 S.Ct. 2886 (emphasis added). The Federal Circuit in *Palm Beach* elaborated that a categorical taking is one in which "*all economically viable use, i.e., all economic value*, has been taken by the regulatory imposition." 231 F.3d at 1357 (second emphasis added). By contrast, the Federal Circuit explained that it had not found a categorical taking in its cases where the property "had substantially reduced . . . value" or "retains value . . . for development." *Id.* at 1360–61.

Relying on *Tahoe–Sierra*, defendant argues that because value remains in the Trusts' property, the court is precluded from finding that a categorical taking has occurred. According to that binding precedent, a categorical taking requires that there be a "permanent obliteration of the value of a fee simple estate." *Tahoe–Sierra*, 535 U.S. at 330, 122 S.Ct. 1465. The Trusts, on the other hand, dispute defendant's interpretation of precedent, but assuming defendant's argument is correct, plaintiffs argue that they nevertheless prevail because the Trusts' property has, in fact, lost all economically viable use and nearly all of its value. Contrary to the Trusts' interpretation of case law, precedent provides that there must be

no economically beneficial use of land in order for the property owner to establish a categorical taking, see *Lucas*, 505 U.S. at 1017, 112 S.Ct. 2886, and here, the Trusts have failed to meet their burden.

■ Relying on the parcel-as-a-whole analysis, the Trusts clearly have property outside of the Range–over 7,000 acres–that has not been impacted by the FUDS designation and can be developed in any manner the Trusts wish. This fact alone defeats the Trusts' argument that a categorical taking has occurred because the Trusts cannot reasonably argue that the issuance of the Final SI Report effected an "obliteration of the value" of the entire property. *Tahoe–Sierra*, 535 U.S. at 330, 122 S.Ct. 1465. In any event, even if the court considers only the property inside of the Range for purposes of determining whether any economically beneficial uses remain, the Trusts have failed to establish a categorical taking.

The Trusts' primary argument is that the highest and best use of their land has been eliminated because they cannot develop the Range Property for industrial, commercial, and residential use. However, the Court of Claims in *Deltona Corp.*, 657 F.2d at 1193, made clear that even if a plaintiff established that it was "denied the highest and best economic use for its property, it is obvious from the Supreme Court tests we have cited [referring, for example, to *Penn Central*] that such an occurrence does not form a sufficient predicate for a taking." "In effect, the 'highest and best use' argument is merely another way of saying that there has been some diminution in value, rather than the complete destruction of all economically viable uses of the property," and "diminution in value, by itself," cannot establish a taking." *Id.*; see also *Carruth v. United States*, 627 F.2d 1068, 1081 (Ct.Cl.1980) (stating that it "is well settled that lawful regulatory action does not constitute a compensable taking merely because the result is to diminish the value of private property, reduce profits, or prevent the most beneficial use of such property."). Therefore, this court rejects plaintiffs' argument that the elimination of the highest and best use gives rise to a categorical taking.

Moreover, the Trusts' own appraisal report, which is based on the value of the Range Property after the Corps' 2009 Final SI Report, states that over $12 million of value remains in the land. Thus, even accepting as accurate all assumptions and conclusions made in the appraisal report, as the court does for its analysis, the Trusts' evidence from the appraisal report reflects that after the issuance of the Final SI Report, the Range Property had an estimated market value of $12,640,000, if it was used for purposes of timber harvesting and recreation. The Trusts argue that the value of the land, even with the ability to sell timber, is reduced to a mere $533.65 per acre, and they assert that the Court of Federal Claims in *Florida Rock* deemed a similar amount a "nominal value." *Fla. Rock,* 45 Fed.Cl. at 37. However, the *Florida Rock* case did not involve a categorical taking. *Id.* at 31. Indeed, in *Florida Rock,* the parties agreed that "all economically beneficial use of the land *was not denied,*" and the court held that economically beneficial use of the land remained after permit denial. *Id.* (emphasis added). Consequently, the Court of Federal Claims concluded that "[t]here was thus no categorical taking of Florida Rock's land." *Id.*

In the case *sub judice,* in addition to timber production, the Range Property was used as a hunting site well before it was designated as a FUDS and the Final SI Report was issued, and was, at the very least, used for hunting purposes for least a year after the report was issued. After the issuance of the June 2009 Final SI Report, and during the pendency of this action, the Trusts continued to lease 13,563.53 acres of property to the South Tangipahoa Hunting Club for $54,254.12 per year (or $4 per acre). As discussed above, Ms. Connelley stated in her deposition in August 2011, that timber production and the lease of land to the hunting club had not been impacted, but Mr. Schneider, in an affidavit in November 2011, stated that no timbering activities were ongoing at the Range Property. At the very least, it is apparent that the Trusts leased land within the Range to the hunting club from September 2010 until August 2011, months after the Final SI Report had been issued. The

Trusts claim that the hunting lease is well below the property's income-producing potential. However, not all economically beneficial use of the land has been eliminated, which is required for a categorical taking. Further, even assuming the Trusts are unable to sell the timber, the value of that timber will remain unaffected, subject to sale whenever the Corps or the Trusts could investigate the property and conduct any necessary remediation. Therefore, the Trusts cannot reasonably argue that all of the Range Property has lost all economically beneficial use. As a result, the Trusts have not established that a categorical taking occurred.

Because there is no support for the Trusts' claim that they have suffered a categorical taking, the court next turns to the Trusts' alternative argument that a noncategorical taking has occurred.

### 3. The Trusts Have Not Established a Noncategorical Taking

 In the alternative, the Trusts assert that the government has effected a noncategorical taking. As noted above, where a regulation that places restrictions on land falls short of eliminating all economically beneficial use, the court weighs three factors to determine if a noncategorical, or partial, taking nonetheless occurred. *See Palazzolo,* 533 U.S. at 617, 121 S.Ct. 2448 (citing *Penn Cent.,* 438 U.S. at 124, 98 S.Ct. 2646). The Supreme Court in *Penn Central* identified these factors as: (1) economic impact of the regulation on the plaintiff; (2) extent to which the regulation has interfered with distinct investment-backed expectations; and (3) character of the governmental action. 438 U.S. at 124, 98 S.Ct. 2646. These factors are considered in terms of the "parcel as a whole." *Id.* at 130–31, 98 S.Ct. 2646. Further, this test involves " 'essentially *ad hoc,* factual inquiries,' ... designed to allow 'careful examination and weighing of all the relevant circumstances.' " *Tahoe–Sierra,* 535 U.S. at 322, 122 S.Ct. 1465 (quoting *Penn Cent.,* 438 U.S. at 124, 98 S.Ct. 2646; *Palazzolo,* 533 U.S. at 636, 121 S.Ct. 2448). A partial taking may be compensable under *Penn Central,* but not all diminutions in value constitute partial regulatory takings. *See*

*generally Fla. Rock Indus., Inc. v. United States*, 18 F.3d 1560, 1570 (Fed.Cir.1994) (discussing diminutions in value versus partial regulatory takings). Here, even assuming that the government action interfered with the Trusts' property interest, the Trusts have not established that a noncategorical taking occurred.

### a. Economic Impact of the Regulation

■ An analysis of the economic impact of the governmental action requires "a comparison of the market value of the property *immediately before* the governmental action with the market value of that same property *immediately after* the action." *Cane Tenn., Inc. v. United States*, 57 Fed.Cl. 115, 123 (2003) (emphasis added); *see also Keystone*, 480 U.S. at 497, 107 S.Ct. 1232; *Walcek v. United States*, 49 Fed.Cl. 248, 258, 267 (2001), *aff'd*, 303 F.3d 1349 (Fed.Cir.2002). Supreme Court decisions suggest that diminutions in value approaching 75% or higher do not necessarily dictate the existence of a taking. *See Vill. of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926) (no taking despite 75% diminution); *Hadacheck v. Sebastian*, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915) (no taking despite at least 87.5% diminution). The Court of Federal Claims has generally relied on diminutions well in excess of 85% before finding a regulatory taking. *See Bowles v. United States*, 31 Fed.Cl. 37, 48–49 (1994) (taking 92–100%); *Formanek v. United States*, 26 Cl.Ct. 332, 340 (1992) (taking 88%); *Loveladies Harbor, Inc. v. United States*, 21 Cl.Ct. 153, 160 (1990) (taking 99%), *aff'd*, 28 F.3d 1171 (Fed.Cir.1994). The Federal Circuit in *Appolo Fuels* determined that losses of 92% and 78% were "manifestly insufficient" to effect a taking. 381 F.3d at 1347. On the other hand, a percentage of value loss around 50% is not indicative of a taking. *See Concrete Pipe*, 508 U.S. at 645, 113 S.Ct. 2264 (no taking 46% diminution); *Jentgen v. United States*, 657 F.2d 1210, 1213 (Ct.Cl.1981) (no taking 50% diminution); *Ciampitti*, 22 Cl.Ct. at 320 (no taking 25% diminution). The Court of Federal Claims has stated that a failure to find a compensable economic impact can be dispositive of the analysis. *Lost Tree Vill. Corp. v. United States*, 100 Fed.Cl. 412, 439 (2011) (concluding that a diminution in value of 58.4% was insufficient to give rise to a taking and that, in the Penn Central analysis, "the economic-impact factor is dispositive").

The Trusts argue that the relevant parcel is the approximately 11,200 acres that it owns inside of the Range, and all of these acres must be considered in the analysis because there is no assurance that all of the bombs fell within the boundaries marked by the government. Moreover, the Trusts claim in uncorroborated affidavits that a developer offered the Trusts "at least" $10,000 per acre, with a total value of the property inside of the Range being valued at $112 million. The highest and best use, the Trusts assert, cannot be achieved since talks with developers ceased after the issuance of the SI Report. Additionally, the Trusts allege that the Range Property has lost anywhere from 82% to 62% of its value, using a cost approach and income approach respectively.

■ In determining the value of the property before and after the governmental action, the parcel-as-a-whole analysis is applied here as well. *Penn Cent.*, 438 U.S. at 130–31, 98 S.Ct. 2646. Even assuming that the Range Property has lost as much as 82% of its value, as the Trusts allege, this assessment fails to consider that the Trusts' property outside of the Range is relevant to the analysis. Because the analysis requires the court to consider the value of the property that constitutes the parcel as a whole, which the court determined to be comprised of the Trusts' property inside and outside of the Range, the diminution of value is far lower than 82% because that 82% does not include the roughly 7,000 acres outside of the Range that are part of the parcel as a whole. Therefore, the economic impact on the Trusts cannot be said to be severe.

■ Even if the court proceeded to analyze this matter as if the Range Property was the entire parcel, based on precedential case law, an 82% diminution of value would not be a sufficient economic impact. *See Loveladies Harbor*, 21 Cl.Ct. at 160 (taking 99%); *Bowles*, 31 Fed.Cl. at 48–49 (taking 92–100%); *Formanek*, 26 Cl.Ct. at 340 (1992)

(taking 88%); *Appolo Fuels,* 381 F.3d at 1347 (no taking at 92% and 78%). Moreover, the diminution in value must be based on the value of the property immediately before and immediately after the alleged governmental action. *See Cane Tenn.,* 57 Fed.Cl. at 123; *see also Keystone,* 480 U.S. at 497, 107 S.Ct. 1232; *Walcek,* 49 Fed.Cl. at 258, 267. With respect to measuring the "immediately before" value, defendant points out that this value in the appraisal assumes that every acre in the Range would be sold and productive for economic use, with no discounts or adjustments, even though the Range Property contains extensive wetland areas. Further, with respect to measuring the "immediately after" value, the date of valuation is not at the time of the alleged taking, the issuance of the Final SI Report, but over thirteen months later, on July 31, 2010. Therefore, the appraisal report relied on by the Trusts contains significant defects that undermine the report's conclusion that there has been a 82% and a 62% diminution in value, depending on the approach used.

### b. Interference With Investment– Backed Expectations

■■■■ The second factor of the *Penn Central* factors–the interference with distinct investment-backed expectations–is a "way of limiting takings recoveries to owners who [can] demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime." *Loveladies Harbor,* 28 F.3d at 1177. A "'reasonable investment backed expectation' must be more than a 'unilateral expectation or an abstract need.'" *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1005–06, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 161, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980)); *Forest Props.,* 177 F.3d at 1366; *767 Third Ave. Assocs. v. United States,* 48 F.3d 1575, 1581 (Fed.Cir.1995).

■■■■ The Trusts assert that they had distinct investment-backed expectations, with the primary expectation being to develop the property to its highest and best use and harvest timber, but those expectations were completely frustrated by government action.

In particular, the Trusts claim that they had concrete and well-developed plans to attain the highest and best use of their property well before the Trusts were aware that an explosive safety risk existed. The Trusts state that "[c]oncrete efforts were made to advance" its development plans.

With respect to the Trusts' claims that they have always sought the highest and best use of the Range Property, which they claim is development, this claim is belied by the fact that for decades, the Range Property has been used for hunting and timber production. Opp'n to Cross–Motion 45. Nonetheless, the Trusts have not provided sufficient evidence to establish that concrete efforts regarding development were indeed taken or that its expectations were "reasonable" and "investment-backed." Unsubstantiated allegations do not constitute evidence. If any entity possessed the evidence to support this bald allegation, it would be one of the plaintiffs. Yet, plaintiffs offer nothing other than generalized statements that cannot suffice.

The Trusts claim broadly that efforts to market its property inside and outside of the Range have included various industrial, commercial, and residential development opportunities. More specifically, they assert that the development of a "mega site" was considered. But the Trusts have not demonstrated that concrete steps were taken before the issuance of the Final SI Report in June 2009, such that the court could conclude that the Trusts' expectations regarding development were reasonable. For instance, with respect to the Strategic Land Plan, before the Final SI Report was issued, the Trusts had not acquired all the property needed to build the necessary interchange, and the Trusts had not sought nor received any of the necessary state and local permits. Sites needed to be identified for certain developments; water and sewer sites needed to be identified; and authorities needed to be petitioned for an interchange. Thus, not only had the Trusts failed to accomplish major steps they had established for themselves to achieve development of their "mega site," but significantly, the Trusts concede that until there is a wetlands determination, any plans for the "mega

site" would be "pie in the sky." Def.'s Ex. E at 59:21–60:5. A "pie in the sky" plan cannot provide the foundation for a reasonable investment-backed expectation. Indeed, their characterizations that a plan is a "pie in the sky" and "reasonable" are polar opposites.

The only other instance provided by the Trusts of an expectation that was frustrated is the Trusts' assertion that they were offered "at least" $10,000 per acre by a developer for property within the Range and just south of the Range. Motion 46. As a preliminary matter, the court finds it curious that a developer would make an offer in terms of the minimum it was willing to pay, inviting a counteroffer to pay the seller a higher amount. Significantly, other than the unsupported affidavits mentioned above that state KB Homes offered "at least" $10,000 per acre, the Trusts fail to provide additional details and/or documentation to substantiate this assertion. For example, the Trusts do not indicate how many acres exactly were to be purchased, when this offer was made, whether the developer was aware that the property had previously been used as a bombing range, whether site inspections were held, and whether the offer was withdrawn because of the issuance of the Final SI Report.

Finally, defendant argues that the Trusts fail to satisfy the factors announced by the Court of Federal Claims in *Cane Tennessee v. United States,* 71 Fed.Cl. 432, 461 (2005): (1) whether the proposed use is legal; (2) whether the proposed use can be physically accomplished; (3) whether the proposed use is financially feasible; and (4) whether the proposed use is the most profitable use. While *Cane Tennessee* is not binding on this court, the court finds the examination of these factors instructive. The Trusts do not dispute that the court should apply these factors, but instead, assert that "[o]bviously, the Trust[s] can accomplish and meet each of these four requirements." Opp'n to Cross–Motion 48. Turning to the first prong of *Cane Tennessee,* the court notes that the Trusts have not established that they would have received the necessary state and local permits to develop the property in the manner they chose, and at this juncture, it is not clear the exact uses that the Trusts had for the property since they had apparently explored "various" industrial, commercial, and residential development opportunities. Pls.' Ex. A ¶ 27. With respect to the second and third factors, the Trusts have not proved that the use or uses of their property could be physically accomplished or were financially feasible. Thus, it is not obvious to the court how the Trusts could "accomplish and meet" these requirements. *See Forest Props.,* 177 F.3d at 1367 (stating that "hope is not enough to show a reasonable investment-backed expectation that might be protected by the Takings Clause"). Moreover, because the Trusts have not stated specifically how they intended to use their property, the court cannot opine on the fourth factor–whether the proposed use or uses was the most profitable. Indeed, with respect to this factor, the court relies on the Trusts' death-blow concession that without a wetlands determination, any plans for their proposed "mega site" are nothing more than "pie in the sky." Obviously, a "pie in the sky" plan does not rise to the level of one that is reasonable–it is merely conjecture or wishful thinking.

The court finds that the Trusts did not have reasonable investment-backed expectations that can be deemed to have been destroyed by the government.

### c. Character of the Governmental Action

Finally, the court looks to the character of the government action, *Penn Cent.,* 438 U.S. at 124, 98 S.Ct. 2646, examining "the purpose of the regulation and its desired effects." *Bass Enters. Prod. Co. v. United States,* 381 F.3d 1360, 1370 (Fed.Cir.2004). *See also Maritrans Inc. v. United States,* 342 F.3d 1344, 1356 (Fed.Cir.2003) ("The character of the governmental action factor requires a court to consider the purpose and importance of the public interest underlying a regulatory imposition."). In *Eastern Enterprises,* 524 U.S. at 537, 118 S.Ct. 2131, the Supreme Court suggested that in considering the character of the government action, the court look also to the extent to which the action is retroactive and whether the action targets a particular individual.

The Trusts argue that the government has transferred the need to protect the public to the Trusts until at least 2019. Moreover, the Trusts assert that the goal of the DERP is to protect public health and safety, but the burden and expense has been placed disproportionately on the Trusts, and if the goal of the DERP and FUDS program is to merely warn private landowners and the public of potentially deadly threats, as defendant asserts, then the government should have warned the Trusts as early as 1986, when the DERP was created.

The court finds that the character of the governmental action in this case serves an important public purpose, that being to warn private landowners and the public of potentially deadly threats that may exist on a FUDS. It cannot be said that the burden falls on the Trusts, but rather that the Trusts will benefit from the governmental action in this case. Pursuant to the purpose of the DERP and FUDS program, the government has advised the Trusts of the potential dangers that may exist on its property and provided it information regarding how to manage that risk until the Corps can move forward with a remedial investigation/feasibility study. Moreover, the fact that the government did not warn the Trusts at earlier junctures is irrelevant for the court's analysis, given that the court does not have jurisdiction to entertain a challenge to the validity of the government's decision. *See M & J Coal Co. v. United States*, 47 F.3d 1148, 1154 (Fed.Cir.1995) (stating that the court must assume in a Fifth Amendment takings case that the government's actions are lawful); *Fla. Rock*, 791 F.2d 893, 898–99 (Fed.Cir. 1986), *cert. denied*, 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987).

\* \* \*

Based on the court's analysis of the *Penn Central* factors, the court concludes that even if there were any economic impact to the Trusts' interests in the Range Property, such impact is not severe and is outweighed by the facts that the Trusts lacked reasonable investment-backed expectations and the character of the government action is strong. Therefore, the court finds that the Trusts have not established that there was a noncategorical taking of the Range Property.

## V. CONCLUSION

For the reasons discussed above, plaintiff's motion for summary judgment is **DENIED,** the government's motion to dismiss is **DENIED,** and the government's cross-motion for summary judgment is **GRANTED.** Plaintiffs' amended complaint is **DISMISSED WITH PREJUDICE.** No costs. The clerk shall enter judgment accordingly.

**IT IS SO ORDERED.**